EUGENE G. IREDALE: SBN 75292
JULIA YOO:  SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525   FAX: (619) 233-3221

Attorneys for Plaintiffs Estate of Valeria Tachiquin Alvarado *et al*.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
### (Hon. Thomas J. Whelan)

| | |
|---|---|
| THE ESTATE OF VALERIA TACHIQUIN ALVARADO by its personal representative, GILBERT ALVARADO; GILBERT ALVARADO in his own right; ELIAS MARTINEZ; ISRAEL ALVARADO and ANALYA ALVARADO through their guardian *ad litem*, GILBERT ALVARADO; ISAAC ALVARADO and REBECCA ALVARADO, through their guardian *ad litem*, VALENTIN TACHIQUIN; VALENTIN TACHIQUIN in his own right; and ANABEL GOMEZ,<br><br>                    Plaintiffs,<br><br>v.<br><br>JUSTIN CRAIG TACKETT and UNITED STATES OF AMERICA,<br><br>                    Defendants. | CASE NO. 13-CV-1202-W JMA<br><br>**PLAINTIFFS' OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT**<br><br>**Date: March 5, 2018**<br><br>**NO ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7.1(d)(1)** |

# TABLE OF CONTENTS

I.  BACKGROUND ...................................................................................1

II.  FACTS ...............................................................................................2

    1.  Prior to clearing Tackett for hire, CBP hiring officials
        had possession of documents establishing Tackett had
        made multiple materially false statements on his CBP
        application forms..............................................................................2

    2.  CBP hiring officials had access to ICSD personnel file
        which contained lengthy and detailed reports of Tackett's
        pervasive dishonesty; mistreatment of detained persons;
        repeated violations of the Fourth Amendment in conducting
        searches and making arrests; and abuse of authority by
        arresting individuals who simply disagreed with him .....................4

    3.  CBP hiring official Stephanie Shavatt asks Tackett about
        his December 2003 notice of resignation, but makes no
        inquiry of ICSD's November 25, 2003 notice of intent to
        terminate which preceded Tackett's resignation............................10

    4.  CBP officials Shavatt, James Gomillion, and Linda Guier
        approved Tackett's application for employment with CBP............11

III.  DISCRETIONARY FUNCTION EXCEPTION DOES NOT
     BAR PLAINTIFFS' NEGLIGENT SCREEN AND HIRE
     CLAIM ...........................................................................................13

    A.  Because CBP's Internal Hiring Policy Adopted Part 731
        of Title 5 of the Code of Federal Regulations, including
        § 731.103(a), CBP Officials Had No Discretion to Hire
        Tackett ..........................................................................................13

    B.  The Government's Contention that § 731.103(a) Is
        Inapplicable Here Because It Refers to "Competitive Service"

i

Positions Is Unavailing Because CBP Adopted Part 731
Without Limitations for All Positions, Including Those
Which Were Not Competitive Service Positions ............................17

C. Application of Part 731 to CBP Hiring Decisions Under
the Federal Career Intern Program, Including Reservation
of Jurisdiction to OPM under § 731.103(a) in Cases of
Material Dishonesty, Is Consistent with Congressional Intent,
Executive Order and OPM Regulation ...........................................19

  1. Background regarding Tackett's "excepted service"
  position under the Federal Career Intern Program .............21

  2. Applying Part 731 to CBP's hiring decisions under
  the Federal Career Intern Program, including 5 C.F.R.
  § 731.103(a), advances the statutory goal of having
  OPM establish and enforce suitability standards for
  hiring civil servants ...........................................................22

  3. The OPM Memorandum dated January 14, 2008
  (Gov't Exh. J) does not apply to this case .........................24

IV.  THE TORT LIABILITY OF PRIVATE EMPLOYERS
UNDER CALIFORNIA LAW GOVERNS PLAINTIFFS'
NEGLIGENT HIRE CLAIM ...............................................................25

A. A Reasonable Factfinder Could Find the United States
Liable for Negligent Hiring Under California Law .......................25

  1. The controlling legal standard for Plaintiffs'
  FTCA negligent hire claim is standard of tort
  liability imposed on *private employers* under
  California law ....................................................................26

  2. The United States' claim that it had no duty to
  exercise due care in screening and hiring Tackett

is premised on inapplicable California caselaw
regarding the liability of municipalities and public
entities in negligent hire cases.............................................30

B. Given Tackett's Extensive History of Retaliatory Arrest,
Abuse of Detainees, and Reckless Disregard of the
Restrictions of the Fourth Amendment, A Reasonably
Prudent Employer Would Have Taken Greater Care in
Investigating and Vetting Tackett Before Hiring Him...................35

V.   THE UNITED STATES' LIABILITY UNDER THE FTCA
IS NOT MERELY VICARIOUS OR DERIVATIVE OF
TACKETT'S LIABILITY...................................................................38

**TABLE OF AUTHORITIES**

**CASES**

*Am. Fed'n of Gov't Emps. v. Hoffman*, 543 F.2d 930, 938 (D.C. Cir. 1976)..20,22

*Berkovitz v. United States*, 486 U.S. 531, 536 (1988) .........................................15

*Bigbee v. Pac. Tel. & Tel. Co.*, 34 Cal. 3d 49, 57 (Cal. 1983) ..........................37

*Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997) ..........................................................................................................................25

*C.A. v. William S. Hart Union High School Dist.*, 53 Cal. 4th 831, 877 (2012) ................................................................................................................... 31,32

*Cremeens v. City of Montgomery*, 602 F.3d 1224, 1226-27 (11th Cir. 2010) ....19

*de Villers v. County of San Diego*, 156 Cal. App. 4th 238, 247 (4th Dist. 2007) .............................................................................................. 32,33

*Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (6th Dist. 2006)..27,31

*Diaz v. Carcamo*, 51 Cal. 4th 1148, 1152 (Cal. 2011) ......................................32

*Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828, 843 (3d Dist. 1992) .............................................................................................. 27,35,36

*Graham v. Connor*, 490 U.S. 386, 396 (1989) .................................................39

*Indian Towing Co. v. United States*, 350 U.S. 61, 64 - 65 (1955) .....................26

*Jalil v. Hampton,* 460 F.2d 923 (D.C. Cir. 1972) .............................................22

*Koepke v. Loo*, 18 Cal. App. 4th 1444 (1983) .................................................34

*National Treasury Employees Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988) .......................................................................................... 21,22,25

*Nevada v. Watkins,* 914 F.2d 1545 (9th Cir. 1990) ...................................... 39,40

*Nigg v. Patterson*, 233 Cal. App. 3d 171, 188 (3d Dist. 1990) ................... 36,37

*Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133, 1139 (4th Dist. 2009) .............................................................................................. 27,28,30

*Rayonier, Inc., v. United States*, 352 U.S. 315, 320 (1957) ..............................38

*Rodarte v. Alameda Cnty.*, 2014 U.S. Dist. LEXIS 129399, *41 (N.D. Cal. 2015) .............................................................................................38

*Thompson v. County of Alameda*, 27 Cal. 3d 741 (Cal. 1980) .........................34

*United States v. Olson*, 546 U.S. 43, 44 (2005) ...................................... 26,27,34

*United States v. Muniz*, 374 U.S. 150, 164 (1963) ...........................................38

*United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) .............................................................................................15

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ......................23

*Zelig v. County of Los Angeles*, 27 Cal. 4th 1112, 1127 (Cal. 2002) ................33

1
2

**STATUTES**

Cal. Gov. Code § 815 ................................................................ 31,32
Cal. Gov. Code § 815.2 ................................................................33
Cal. Gov. Code § 820 ...................................................................33
5 U.S.C. § 1103 ...........................................................................21
5 U.S.C. § 1104 ................................................................ 20,23,24
5 U.S.C. § 2101 ...........................................................................20
5 U.S.C. § 2102 ...........................................................................21
5 U.S.C. § 3301 ...........................................................................20
5 U.S.C. § 3302 ................................................................... 21,22
18 U.S.C. § 1001 ...........................................................................2
28 U.S.C. § 1346 ................................................................ *passim*
28 U.S.C. § 2674 ................................................................ 26,33

**REGULATIONS**

5 C.F.R. § 6.1 ..............................................................................21
5 C.F.R. § 213.3202 ........................................................... 22,23,24
5 C.F.R. § 731.101 ...................................................................18,19
5 C.F.R. § 731.103 ............................................................... *passim*
5 C.F.R. § 731.201 ......................................................................18
5 C.F.R. § 731.202 ......................................................................18
5 C.F.R. § 731.301 ......................................................................19
Executive Order 10577 ........................................................ 21,25
Executive Order 13162 ...................................................... 22,23,24

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.

# BACKGROUND

In an order dated May 14, 2015 related to the United States' Motion to Dismiss, this Court held the discretionary function exception (DFE) did not defeat Plaintiffs' fifteenth cause of action against the United States, under the Federal Tort Claims Act, for the negligent screening and hiring of Justin Tackett.  (Doc. 107).  The Court found that Plaintiffs had made a showing that Tackett had intentionally made a material misrepresentation during the application process when Tackett falsely stated on his Declaration for Federal Employment that he had not quit after being told he would be fired.  (Order at pp. 13 – 14).  Defendant United States "knew Tackett quit his job with the ICSD (Imperial County Sheriff's Department) shortly after being told that he would be fired because an investigation services notified Defendant that Tackett had received Notices of Intent to Terminate from the ICSD prior to his resignation." (*Id*. at p. 13).  Given evidence that Tackett may have made a material misrepresentation, the Court held that 5 C.F.R. § 731.103(a) "provided that OPM *alone* retained jurisdiction to make the determination of Tackett's suitability in light of the evidence of the material misrepresentation. Defendant hired Tackett without so much as consulting OPM." (Order at p. 15).

Now, on summary judgment, Plaintiffs further submit evidence to show that CBP hiring officials had actual possession of one of Imperial County Sheriff's Department's (ICSD's) notices of intent to terminate Tackett related to the Bertussi incident (described in Plaintiffs' second amended complaint at ¶ 87).  CBP officials also possessed Tackett's letter of resignation, submitted to ICSD after Tackett received the notice of intent to terminate.  As part of the background investigation of Tackett, CBP officials possessed ICSD's notices of disciplinary action issued to Tackett for the Lackey incident (described in Plaintiffs' SAC at ¶ 86) and for Tackett's conduct in repeatedly lying to and purposefully deceiving

superior officers at ICSD (described in Plaintiffs' SAC at ¶89).  CBP hiring officials were able to review these ICSD documents prior to clearing Tackett for hire as a Border Patrol Agent.

## II.

## FACTS

**1. Prior to clearing Tackett for hire, CBP hiring officials had possession of documents establishing Tackett had made multiple materially false statements on his CBP application forms.**

On November 14, 2005, Justin Tackett submitted a "Declaration for Federal Employment" that certified as true, correct, complete, and in good faith, the response to question no. 12: "During the last 5 years have you been fired from any job for any reason, did you quit after being told that you would be fired, did you leave any job by mutual agreement because of specific problems, or were you debarred from Federal employment by the Office of Personnel Management or any other Federal agency? *If "YES," use item 16 to provide the date, an explanation of the problem, reason for leaving, and the employer's name and address*."  (Exh. 1, Tackett Decl. Federal Employment at BI-367) (emphasis in the original).  In response, Tackett marked "NO."  (*Id*.).

On January 13, 2006, Justin Tackett completed an application for the company Kroll entitled, "CBP Background Investigation Personal Interview."  (Exh. 2, Kroll application).  In answering the questions on this application and signing his application, Tackett acknowledged that he understood that any "[f]ailure to provide accurate and truthful statements could result in denial of employment and/or security clearance and may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001)."  (*Id*. at BI – 348).  Question no. 113 of the application asked, "[h]ave you **ever** resigned in lieu of charges (of any kind being filed against you?  If yes, provide details."  (*Id*. at BI – 334) (emphasis in the original).  Tackett marked "No".  (*Id*.).  Question no. 114 queried, "[h]ave you **ever** resigned when advised that your employer was planning to file

charges (any type) against you?  If yes, provide details." (*Id*. BI-335)(emphasis in the original).  To question no. 114, Tackett again marked "No". (*Id*.).  Question no. 115 asked, "[h]ave you ever been discharged (fired) or otherwise terminated from employment for any reason?  If yes, ascertain circumstances." (*Id*.) (emphasis in the original).  To question no. 115, Tackett marked "No." (*Id*.)

On January 19th and 20th, 2006, a background investigation was conducted regarding Tackett's employment with the Imperial County Sheriff's Department (ICSD).  (Exh. 3, report of Tackett's employment with ICSD).  The report of that investigation noted that "adverse information" was obtained from Tackett's personnel folder at ICSD.  (Exh. 3 at BI – 294).  The following documents from ICSD were specifically noted in the report and submitted to CBP hiring officials for their review (*id*.):

1. Notice of proposed disciplinary actions dated 10/18/2002, 6/21/2002, 11/16/2001, 9/25/2001 all related to automobile accidents;

2. Notice of proposed disciplinary action dated October 3, 2002 for "unprofessional conduct, incompetence, violation of regulations, unbecoming conduct, and arrest, search, and seizure;"

3. Notice of proposed disciplinary action dated April 4, 2003 for "unprofessional conduct, violation of regulations, insubordination, violation of rights, and unbecoming conduct;"

4. Notice of proposal to terminate employment dated November 25, 2003, related to the arrest of Reno Bertussi, which included Tackett's signature indicating he had read and received the notice of intent to terminate on November 25, 2003; and

5. Tackett's letter of resignation from ICSD with a date stamp showing ICSD received it on December 19, 2003.

(Exh. 3 at BI – 294; *see also* Exh. 4, documents from Tackett's ICSD personnel file).  These documents from Tackett's ICSD personnel file were part of CBP's

background investigation of Tackett, submitted to CBP hiring officials for their review, and given to Plaintiffs by the United States in response to Plaintiffs' discovery request.  (Exh. 5, USA RFP responses and letter providing responsive discovery; Decl. Grace Jun at ¶¶ 2, 7).

Thus, as part of Tackett's background investigation, CBP officials had possession of: (1) ICSD's notice of intent to terminate Tackett related to the Bertussi incident, clearly setting forth the bases for the Department's decision to terminate Tackett; (2) Tackett's letter of resignation, which he submitted to ICSD after receiving the notice of intent to terminate; and (3) multiple disciplinary reports from ICSD, many written by Sheriff Carter, extensively documenting Tackett's misconduct, deception, and violations of the Fourth Amendment while he was an ICSD deputy.  (*Id*.).

**2.    CBP hiring officials had access to ICSD personnel file which contained lengthy and detailed reports of Tackett's pervasive dishonesty; mistreatment of detained persons; repeated violations of the Fourth Amendment in conducting searches and making arrests; and abuse of authority by arresting individuals who simply disagreed with him.**

One of the ICSD disciplinary notices which CBP officials possessed as part of Tackett's background investigation included Imperial County Sheriff Harold Carter's notice of disciplinary action dated April 4, 2003.  Sheriff Carter summarized Tackett's misconduct at the Imperial County Sheriff's Department as follows:

> The thread that runs through your subject activities is your repeatedly placing yourself above and before (1) the Department itself and its mission on behalf of the community, (2) your supervisors and their orders to you, (3) your fellow peace officers and their ethical obligations, and (4) your own ethical obligations as a sworn peace officer.  You are not a law unto yourself but no more than an appointed deputy charged with enforcing the laws of the State of California and County of Imperial.

Exh. 4 at BI – 250.

Sheriff's Carter's April 4, 2003 disciplinary notice imposed a 30-day suspension, without pay, on Tackett for an incident which occurred January 30, 2002. Tackett had repeatedly lied to his direct superior officer, Sergeant Avila, who had ordered Tackett, multiple times on multiple separate dates, to refrain from conducting any probation or parole searches. (Exh. 4, BI – 248). Tackett circumvented Sergeant Avila's direct orders, persuaded other police officers to assist him in conducting probation searches, and, when confronted by Sergeant Avila, Tackett lied by telling Avila that he was not conducting probation searches. (*Id*. BI 248 – 249). Sheriff Carter observed Tackett's conduct was not the product of an accident or mere misunderstanding, but found:

> Your conduct demonstrates a determined premeditated plan to circumvent your supervisor's direct orders. Your elaborate plans encompassed using and manipulating other law enforcement officers to assist you in your deception. Far from being accidental or inadvertent, your actions betray a calculated contempt for any direct orders with which you disagree.

(Exh. 4 at BI 249 – 250).

Sheriff Carter noted Tackett's conduct in the internal investigation after the probation search incident to reflect consciousness of guilt. (*Id*. BI – 250). During the internal investigation after the incident, Tackett had denied requesting other police officers assist him in arranging the probation search, a statement that was contradicted by two fellow deputies. (*Id*. BI-249). Tackett attempted to mislead the investigator questioning him by engaging in "word games," denying he was involved in a probation search and claiming that he was "only checking to see if these probationers were 'following their guidelines.' This evasion on your part was insubordinate and dishonest." (*Id*.). Sheriff Carter wrote, "in repeatedly attempting to deceive both Sgt. Avila on the day in question and Sgt. Matus during his investigation of this matter, you have made clear that you knew you were

1   engaged in misconduct.  No aspect of a law enforcement officer's duties is more

2   critical than honesty, regardless of the consequences to himself or others."  (*Id*.).

3   Sheriff Carter went on to write, "[p]eace officers, charged with enormous powers,

4   must adhere to various orders, rules and laws, regardless of whether they are

5   inclined to agree with them.  Aggravating the gravity of your offense is the fact of

6   your lack of candor before and afterwards."  *Id*. at BI – 251.

7        On April 4, 2003, Sheriff Carter issued a second, separate disciplinary notice

8   to Tackett regarding an incident involving Randy Lackey that had occurred in the

9   early hours of December 28, 2001.  (Exh. 4 at BI – 257.)  Tackett had driven onto

10  the private property of Randy and Andrea Lackey based upon his suspicion that

11  their black Jeep had been involved in a hit-and-run earlier that evening.  (*Id*.).  He

12  had no warrant.  (*Id*.).  Tackett failed to observe that dirt and cobwebs covered the

13  Jeep, indicating it had not been moved in a long period of time.  (*Id*.).  Rather than

14  wait outside the property as requested by dispatch, Tackett moved his patrol car

15  close to the Lackey's home and flooded the house with his headlights, spotlight,

16  and alley lights.  (*Id*.).  Randy Lackey emerged into the chill December evening,

17  clad only in blue jeans; he informed Tackett that his Jeep had not been moved in a

18  while.  (*Id*.).

19       When Mr. Lackey sought to return into his home due to the cold, Tackett

20  informed Lackey that he was now detained for "investigative purposes and for

21  officer safety reasons."  (Exh. 4 BI 257-258).  When Mr. Lackey continued to try

22  to return to his home, Tackett advised him that he would be arrested for delaying,

23  resisting, or impeding a police officer.  (*Id*. BI 258).  Tackett radioed for back-up,

24  and, after a brief struggle, placed handcuffs on Lackey.  (*Id*.).  When a Sergeant

25  Myron King arrived, he urged Tackett to release Mr. Lackey.  Tackett refused.

26  (*Id*.).  Srgt. King finally ordered Tackett to immediately cite and release Mr.

27  Lackey.  (*Id*.).

28       Sheriff Carter noted Tackett had neither sufficient probable cause or any

exigent circumstance to justify Tackett's entry onto the Lackey's private property. (*Id*.). Contrary to Tackett's expressed concerns regarding "officer safety," Sheriff Carter found that Tackett's actions in illuminating the Lackey's entire home before the arrival of backup, and contrary to instructions, increased the risk "that a confrontation would occur before backup arrived." (*Id*.). Carter found that an officer safety issue would have never occurred had Tackett "waited on the street, adjacent to the property and did nothing to draw attention to yourself." (*Id*.).

Finally, Sheriff Carter found Tackett's treatment of Lackey "troubling." (*Id*.). Lackey had sought to return to his home because of the cold. (*Id*.). Tackett's actions "compelling Mr. Lackey to freeze or be arrested was unreasonable. Your arrest of him was ill-advised and reflected poor judgment. In light of all the other alternatives, your handling of Mr. Lackey was improper." (Exh. 4 at BI 259). Sheriff Carter also admonished Tackett for Tackett's refusal to accept responsibility for his conduct: "At no time have you taken any responsibility for inappropriate actions or admitted any error in your course of conduct. During your interviews and at your first Skelly conference with me, you had more than ample opportunity to demonstrate insight and remorse. We all make mistakes. Mature adults acknowledge errors and accept responsibility. You have done neither." (*Id*.).

On November 25, 2003, the Imperial County Sheriff's Department issued a notice of intent to terminate Tackett's employment due to an incident involving an individual named Reno Bertussi that had occurred on May 22, 2003. (Exh. 4, BI 266 – 272). This notice of intent to terminate Tackett, written by Chief Deputy Jesse Obeso, was included in Tackett's background investigation and submitted to CBP hiring officials for their review. *See* Exh. 3 at BI – 294; *see also* Exh. 5, United States' responses to Plaintiffs' discovery requests.

On May 22, 2003, Tackett went to the home of an individual named Reno Bertussi at the behest of Leslie and Jamie Parsons, who had both signed citizens'

arrest forms for Bertussi.  (Exh. 4 at BI-267).  Leslie Parsons accused Bertussi of stealing his property, including a big-screen TV, and storing Parsons' property at Bertussi's business, JT Towing.  (*Id*.).  When Leslie and Jamie Parsons attempted to retrieve Leslie's property from Bertussi, Bertussi allegedly struck Leslie three times in the head with his fist and allegedly throwing a metal clasp at Jamie, which struck her cheek.  (*Id*.).

Tackett, after taking the Parsons' report, drove to Bertussi's resident with Jamie and Leslie Parsons.  (*Id*.).  Once at Bertussi's property, Tackett peered over Bertussi's yard wall in an attempt to convince Bertussi to meet him and other deputies at the gate.  (Exh. 4 BI 267 – 268).  After Bertussi ignored Tackett, Tackett stood on his patrol car to climb over the wall because, according to Tackett, this constituted an "officer and public safety issue").  (*Id*. BI-268).  Tackett knew Bertussi's home was private property and that he had neither a search warrant nor permission to enter the property.  (*Id*.).  Tackett acknowledged Bertussi was cooperative and did not resist, indicating there was neither an officer or public safety issue.  (*Id*.).  Tackett further acknowledged that he could have left the scene and submitted a criminal report to the District Attorney's Office.  (*Id*.).  Thus, no exigent circumstances existed.  (*Id*.).

The ICSD determined that Tackett's decision to enter Bertussi's private property without a warrant, consent, or exigent circumstance was unlawful.  (Id.).  Tackett then placed Bertussi in handcuffs and took Bertussi to his shop, purportedly to question Bertussi.  (*Id*. BI 268 – 269).  But the ICSD found Tackett's questioning of Bertussi in Bertussi's shop to be "nothing more than a transparent attempt" to gain access to Bertussi's shop for the purpose of searching the shop for the Parsons' property.  (*Id*. BI-269).  "Clearly, your search of Bertussi's shop was improper in that you did not have a right to be in the yard where the shop was located; thus, you had no right to search the shop."  (*Id*.).

Tackett then placed Bertussi in a hot patrol car with the doors closed,

windows rolled up, and the air conditioning turned off in temperatures of 87.8 degrees with 35 percent humidity.  (*Id*.).  Tackett admitted he saw Bertussi "banging on the window" of the patrol car and estimated that Bertussi had sat handcuffed in the patrol car for 15 – 20 minutes.  (*Id*.).  When Bertussi complained of the heat and requested medical attention, Tackett ignored his request.  (*Id*.).  Chief Deputy Obeso stated in his letter, "I have no confidence in your ability to treat suspects humanely."  (*Id*.).  Chief Deputy Obeso referenced Tackett's two (2) day suspension for, "amongst other things," forcing Lackey to stand outside in a cold winter night without offering Lackey any assistance.  (*Id*.).

After placing a handcuffed Mr. Bertussi in the hot patrol car, Tackett proceeded to the Bertussi home, still without any warrant, to confiscate the Bertussi's big screen TV.  When Mrs. Bertussi refused to allow Tackett into her home, Tackett "informed Mrs. Bertussi that if she refused to turn over the television she could be arrested in relation to the possession of stolen property." (*Id*. BI-270).  Mrs. Bertussi, in response to Tackett's "coercive threat of legal prosecution," permitted Tackett to enter her home and remove her big-screen TV. (*Id*.).  Chief Deputy Obeso wrote, "[t]his is a clear abuse of your authority as a sworn public safety officer and cannot be tolerated.  Moreover, it has cast a shadow of dishonor upon the Department and will undoubtedly bring into question the lawfulness of other searches that you and/or this Department conducts."  (*Id*.).  Chief Deputy Obeso concluded the notice of intent to terminate by highlighting the District Attorney's refusal to prosecute the Bertussi arrest because of "**search and seizure issues related to your [Tackett's] entry onto the property without a warrant, your subsequent search of the other areas, and your seizure of property from the Bertusi (*sic*) home, placement of Bertusi (*sic*) into the car without air conditioning, and your personal friendship with one of the victims.**"  (*Id*.)(emphasis in the original).  The Imperial County District Attorney's refusal to prosecute the Bertussi arrest was attached to the November 25, 2003

letter and included in the background material provided to CBP hiring officials. (Exh. 4 at BI – 279).

Chief Deputy Obeso stated, "I must conclude that no remedy short of your termination can protect our community, this Department and the County's peace officers." (*Id*. BI -270) (emphasis added). Tackett acknowledged that he had read and received the notice to terminate his employment on November 25, 2003. (*Id*. BI – 272). Tackett submitted his letter of resignation shortly thereafter, with the Sheriff's Department indicating it received Tackett's notice of resignation on December 19, 2003. (*Id*. BI – 280).

**3.  CBP hiring official Stephanie Shavatt asks Tackett about his December 2003 notice of resignation, but makes no inquiry of ICSD's November 25, 2003 notice of intent to terminate which preceded Tackett's resignation**.

On May 25, 2006, Stephanie Shavatt issued Tackett a "Notice of Proposed Action" (NOPA) inquiring about multiple incidents at the Imperial County Sheriff's Department. (Exh. 6, NOPA to Justin Tackett dated May 25, 2006, BI-070-072). Shavatt asked Tackett to explain a number of derogatory items from the ICSD personnel file, including: (1) Tackett's resignation from the ICSD in December of 2003; (2) Tackett's 30-day suspension for deceiving his commanding officer to conduct probation searches; (3) the April 4, 2003 notice of disciplinary action, which imposed a 2-day suspension for the Lackey incident; and (4) the various suspensions Tackett received for speeding and wrecking multiple patrol cars. (*Id*., BI-070).

Shavatt did not ask Tackett to explain the ICSD's November 25, 2003 notice of intent to terminate Tackett, which included Tackett's acknowledgement that he had received and read the notice of intent to terminate. She did not ask Tackett to explain why he resigned in December 2003 after receiving the notice of termination. Despite CBP's possession of both the ICSD's November 25, 2003 notice of intent to terminate Tackett and Tackett subsequent letter of resignation,

Shavatt did not ask Tackett why he had consistently denied quitting after being told he would be fired.  For example, Shavatt did not question Tackett about why he had answered "NO" on his November 2005 Declaration for Federal Employment in response to question no. 12, which had asked if, in the past five years, Tackett had ever quit a job after being told he would be fired.

**4. CBP officials Shavatt, James Gomillion, and Linda Guier approved Tackett's application for employment with CBP.**

On April 11, 2006, Stephanie Shavatt issued a "Suitability Evaluation Sheet" that cleared Tackett for hire.  (Exh. 7, BI-015-019).  Shavatt made no mention of the November 25, 2003 notice of intent to terminate Tackett.  Shavatt made no mention of Chief Deputy Obeso's statement in the November 2003 letter that "no remedy short of [Tackett's] termination can protect our community, this Department, and the County's peace officers."  (*See* Exh. 4 at BI – 271).  Shavatt did not reference the Imperial County District Attorney's refusal to prosecute the Bertussi arrest, which was attached to the November 25, 2003, notice, which noted the numerous Fourth Amendment violations and noted Tackett's "personal friendship with a vic going back to high school, all make this case problematic!" (*See* Exh. 4 at BI-279).  Shavatt made no mention of Sheriff Carter's finding of Tackett's pervasive dishonesty, repeated attempts to deceive commanding officers, and lack of candor when confronted with evidence of his misconduct, which Sheriff Carter extensively documented in his April 4, 2003 disciplinary notice for Tackett's probation searches.  (*See* Exh. 4 at BI-247-252).  Shavatt appeared to dismiss evidence of Tackett's misconduct documented by ICSD as "allegations of misconduct or negligence" that Tackett was "appealing" through his federal lawsuit against the ICSD.  (Exh. 7, BI-019).

On May 18, 2006, the Imperial County Sheriff's Department filed a motion for summary judgment in case no. 04-CV-2459-J-PCL (doc. 46).  In support of its motion for summary judgment filed on May 18, 2006, Imperial County attached 38 exhibits and provided fifteen sworn declarations, including declarations from

Sheriff Harold Carter, Chief Deputy Jesse Obeso, Sergeant Myron King, and Sergeant Manuel Avila.  (*See* docs. 48, 49, and 50 in case no. 04-cv-2459). Notably, Sheriff Carter in his declaration that he had referred Tackett's actions in the Bertussi and Macias incidences to an outside, independent investigator because he anticipated complaints from Tackett's parents and his grandfather regarding the Sheriff Department's investigations of Tackett: "[t]hus, despite the fact that I did not have any concerns or suspicions of bias, discrimination or improper conduct by anyone in the Department, these matters were nonetheless referred to an outside, independent investigator to avoid even the possibility of any complaints about disparate treatment, and to avoid even the appearance of impropriety." (Decl. Harold Carter at ¶ 10, doc. 49, page 12 of 403, case no. 04-cv-02459)[1].  Imperial County then attached, as exhibit 29 in support of its motion for summary judgment, the entire independent administrative investigation of Tackett in the Macias incident[2], conducted by the firm Norman A. Traub Associates, which consisted of approximately 179 pages. (Doc. 48, pp. 10 – 189).  Imperial County attached, as exhibit 33 in support of its summary judgment motion, the administrative investigation, also conducted by the firm Norman A. Traub Associates, of the Bertussi incident (Doc. 48, pp. 214 – 633).  Exhibit 33, the Bertussi investigation, consisted of 419 pages.

---

[1] To avoid confusion and to remain consistent with references to the Pacer docket, Plaintiffs refer to the ECF file stamp at the top of each page when referencing page number for exhibits attached in support of Imperial County's motion for summary judgment in case no. 04-cv-2459.

[2] On November 25, 2003, ICSD served Tackett with a separate notice of intent to terminate him based on the Macias incident.  (Exh. 30 to ICSD Motion for Summary Judgment, Case no. 04-cv-2459, doc. 48, pp. 191 – 207).  The Macias incident is described in Plaintiffs' SAC at ¶¶ 65 – 74.  The ICSD's notice of intent to terminate Tackett based on the Macias incident was not contained in Tackett's background investigative material which the United States provided to Plaintiffs in discovery.

On June 30, 2006, James Gomillion, a Senior Personnel Security Specialist, issued a concurrence, agreeing that Tackett should be cleared for hire.  (*Id*. at BI-020).  With respect to ICSD's proposed disciplinary actions, Gomillion stated "[t]he facts surrounding the employment incidents are being adjudicated in a pending lawsuit in the Federal Court system.  Refer to the court case for detailed information." (Exh. 7 at BI-020).  Despite his awareness of Tackett's lawsuit and his reference to the case, Gomillion made no mention of the motion for summary judgment filed by the Imperial County Sheriff's Department on May 18, 2006, or the thousands of pages of exhibits attached in support of the Department's attempts to terminated Tackett.  A handwritten note on Gomillion's concurrence states, "[d]iscussed with Linda Guier, Asst Dir Operations, and she concurred with clear." (*Id*. BI-020).

## III.
## DISCRETIONARY FUNCTION EXCEPTION DOES NOT BAR PLAINTIFFS' NEGLIGENT SCREEN AND HIRE CLAIM

**A. Because CBP's Internal Hiring Policy Adopted Part 731 of Title 5 of the Code of Federal Regulations, including § 731.103(a), CBP Officials Had No Discretion to Hire Tackett.**

The Government now contends that the mandatory language of 5 C.F.R. § 731.103(a) (2006), requiring agencies to refer all cases involving "evidence of material, intentional false statement or deception or fraud in examination or appointment" to OPM for adjudication, does not apply to CBP hiring authorities in this case because Tackett was hired in an "excepted service" position and not a "competitive service" position.  (USA Mem. Ps. & As., doc. 124-1, at p.10). Whether Tackett was hired in an "excepted service" position versus a "competitive service" position is irrelevant because CBP, in 2006, had an internal hiring policy adopting the entirety of Part 731 of Title 5 of the Code of Federal Regulations.  *See* Plaintiffs' Exhibit 8.  Section 731.103(a) is a subsection within Part 731 of Title 5 of the Code of Federal Regulations.  Thus, CBP's internal policy compelled

officials to follow the mandatory requirement of section 731.103(a) and refer Tackett's employment application to OPM.

As a preliminary matter, a review of the structure of Part 731 of Title 5 of the Code of Federal Regulations (2006) may aid in understanding references to various subsections:

### PART 731—SUITABILITY

#### Subpart A—Scope

Sec.
731.101  Purpose.
731.102  Implementation.
731.103  Delegation to agencies.
731.104  Appointments subject to investigation.
731.105  Authority to take suitability actions.
731.106  Designation of public trust positions and investigative requirements.

#### Subpart B—Suitability Determinations

731.201  Standard.
731.202  Criteria.
731.203  Actions by OPM and other agencies.
731.204  Debarment by OPM.
731.205  Debarment by agencies.

#### Subpart C—OPM Suitability Action Procedures

731.301  Scope.
731.302  Notice of proposed action.
731.303  Answer.
731.304  Decision.

#### Subpart D—Agency Suitability Action Procedures

731.401  Scope.
731.402  Notice of proposed action.
731.403  Answer.
731.404  Decision.

#### Subpart E—Appeal to the Merit Systems Protection Board

731.501  Appeal to the Merit Systems Protection Board.

*Excerpted from USA Exhibit F*, doc. 124-4, at USA-NOL-53

The discretionary function exception does not apply when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "[C]onduct cannot

1    be discretionary if it violates the Constitution, a statute, or an applicable regulation.

2    Federal officials do not possess discretion to violate constitutional rights or federal

3    statutes." *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d

4    Cir. 1988).  "Thus, the discretionary function exception will not apply when a

5    federal statute, regulation, or policy specifically prescribes a course of action for an

6    employee to follow.  In this event, the employee has no rightful option but to

7    adhere to the directive." *Berkovitz*, 486 U.S. at 536.

8          In 2006, CBP's policy on hiring employees incorporated the entirety of Part

9    731 of Title 5 of the Code of Federal Regulations as the agency's hiring standard.

10   (Exh. 8, CBP's Personnel Security Handbook (December 2006), at p. 13).  The

11   policy states, "CBP has delegated authority from the Office of Personnel

12   Management (OPM) to conduct background investigations and make employment

13   suitability determinations.  Investigations are conducted to ensure that the

14   candidate is reliable, trustworthy, of good conduct and character and loyal to the

15   United States, *i.e.*, suitable for employment." (Exh. 8 at p. 6).  The CBP policy

16   manual further states, "[a]ll applicants for a position with CBP must undergo an

17   investigation to determine suitability for employment." (*Id*. p. 11).  Under the title

18   "Adjudication," the policy manual states, "**Title 5, Code of Federal Regulations,**

19   **Part 731, 'Suitability,' is used to conduct suitability determinations**." (*Id*. p.

20   13) (emphasis added).

21         The Government provided CBP's Personnel Security Handbook in response

22   to Plaintiffs' Requests for Production.  The Government stated the only policy

23   CBP had in place in for the time period of January 1, 2003 to December 31, 2006,

24   with respect to 5 C.F.R. § 731.103(a), is the Personnel Security Handbook:

25         **REQUEST FOR PRODUCTION NO. 40:**
26         For the time period of January 1, 2003 to December 31,
         2006, any and all DOCUMENTS, records, including
27         ELECTRONICALLY STORED INFORMATION,
         regarding any Customs and Border Protection (CBP)
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

policy, memoranda, bulletin, e-mail, or directive related to 5 CFR 731.103(a).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**
Defendant objects to this request as overbroad, burdensome, oppressive and compound. Without waiving any objections, **Defendant has located a Personnel Security Handbook from December 2006 which is the only responsive document located with respect to this request.**

(Exh. 9, USA Response to Plaintiffs' Request for Production (Set Four)) (emphasis added). The United States provided the declaration of Jerry Tavenner, the Assistant Director for the Policy, Records, Reports & FOIA Unit within the Personnel Security Division of CBP, with its discovery responses. (*See* Exh. 9) Mr. Tavenner averred that the 2006 CBP Handbook was the only CBP document reflecting any policy related to 5 C.F.R. § 731.103 for the time period of January 1, 2003 to December 31, 2006. (Decl. Jerry Taveenner, Exh. 9, at ¶ 3). The CBP Handbook "was the initial CBP issuance which documented the procedures associated with employment background investigations following the merger to create the DHS/CBP in 2003. This Handbook documented the policies and procedures in place at the time of issuance and as such, **represent the policies and procedures in place prior to its issuance.**" (*Id*. ¶ 8)(emphasis added).

The Government therefore represents the only policy CBP had in place with respect to 5 C.F.R. § 731.103(a) was its 2006 Personnel Security Handbook which adopted the entirety of Part 731 of Title 5 of the Code of Federal Regulations. (*Id*.). The Government has produced no evidence that CBP had an internal policy or directive *exempting* the application of 5 C.F.R. § 731.103(a) from the agency's hiring process.

In fact, the "Suitability Evaluation Sheet" for Justin Tackett, signed by CBP hiring official Stephanie Shavatt on April 11, 2006, shows that 5 C.F.R. §

731.103(a) applied to CBP's hiring determinations.  Plaintiffs previously submitted to this Court the "Suitability Evaluation Sheet" on February 3, 2015, in support of Plaintiffs' opposition to the United States' motion to dismiss the fifteenth cause of action for negligent screening and hire.  *See* doc. 88-7.  The first page of the Suitability Evaluation Sheet used by CBP for Justin Tackett specifically lists the following under the title, "Suitability Factors:"

> 1. Dishonest Conduct (use only after OPM refers Falsification case back to CBP)
> 2. **Falsification (material, <u>refer to OPM</u>)** . . .

Doc. 88 – 7 (emphasis added).

Hence, whether Tackett held an "excepted service" or "competitive service" position is of no moment.  The discretionary function exception does not apply to Plaintiffs' fifteenth cause of action for negligent screening and hiring because CBP's own internal policy affirmatively adopted the entirety of Part 731 of Title 5 of the Code of Federal Regulations (2006 ed.).  Pursuant to their own internal policy, CBP officials had no discretion to hire Tackett, but were required to refer his application to OPM due to evidence of intentional dishonesty.

**B. The Government's Contention that § 731.103(a) Is Inapplicable Here Because It Refers to "Competitive Service" Positions Is Unavailing Because CBP Adopted Part 731 Without Limitations for All Positions, Including Those Which Were Not Competitive Service Positions.**

Despite CBP's explicit adoption of Part 731 as part of its hiring policy in 2006, and despite the April 11, 2006 "Suitability Evaluation Sheet" which instructed CBP hiring officials to refer cases with evidence of material falsification to OPM, the Government nonetheless insists that the mandate of § 731.103(a), compelling CBP officials to refer Tackett's application to OPM, does not apply in this case.  According to the Government, § 731.103(a) applies only to "competitive service" positions and Tackett was hired under the Federal Career Intern Program, an excepted service position.

1    Confusingly, the Government contends some subsections of Part 731 applied

2    to excepted service positions like Tackett's, while other subsections did not apply

3    to Tackett.  For example, Joseph Westmoreland avers that that the suitability

4    standards of § 731.202 (still within Part 731 of Title 5) applied to CBP hiring

5    decisions under the Federal Career Intern Program.  (Westmoreland Decl., doc.

6    124-2, at ¶¶ 3-4).  By its text, the entirety of Part 731 of Title 5 to the regulations,

7    including § 731.202, applied only to competitive service positions in 2006.  *See* 5

8    C.F.R. § 731.101(a) (2006).  Section 731.101 (entitled "Purpose") of Part 731

9    ("Suitability"), states as follows: "**The purpose of this part is to establish**

10   **criteria and procedures for making determinations of suitability for**

11   **employment in positions in the competitive service** and for career appointment

12   in the Senior Executive Service . . ." 5 C.F.R. § 731.101(a) (2006) (emphasis

13   added) (attached hereto as Exhibit 10).  However, when CBP adopted the hiring

14   provisions of Part 731 as a matter of policy for all CBP positions, these textual

15   differences ceased to exempt CBP excepted service positions from Part 731's

16   requirements.  Otherwise, Westmoreland's declaration is nonsensical.

17   The Government apparently acknowledges that all of Part 731 applied to

18   competitive service positions because it highlighted the language of § 731.101

19   ("Purpose") in its lodgment with the Court.  (*See* USA-NOL-54, doc. 124-4).  But

20   the Government provides no explanation to as why § 731.202 (a subsection within

21   Part 731) purportedly applied to CBP's suitability determinations for "excepted

22   service" positions, while § 731.103(a) (a different subsection within Part 731) did

23   not apply.[3]

24

25   _____

     [3] Should the Government contend, in reply, that § 731.101 ("Purpose")

26   applies only to subpart A of Part 731 ("Scope"), and § 731.202 is distinct because

     it is under subpart B of Part 731, Plaintiffs note that subpart B is still subject to

27   subpart A.  *See* 5 C.F.R. § 731.201 (2006) ("Subject to subpart A of this part, an

     applicant, appointee, or employee may be denied Federal employment only when

28   the action will protect the integrity or promote the efficiency of the service.").

In any event, the limitation of OPM's jurisdiction to "competitive service cases" in 5 C.F.R. § 731.103(a) (2006) cannot be dispositive because CBP adopted all of Part 731 to its suitability determinations of prospective employees. Government's argument that §731.103(a) did not apply to CBP hiring officials is therefore without merit and the discretionary function exception does not bar Plaintiffs' negligent hiring claim.

**C. Application of Part 731 to CBP Hiring Decisions Under the Federal Career Intern Program, Including Reservation of Jurisdiction to OPM under § 731.103(a) in Cases of Material Dishonesty, Is Consistent with Congressional Intent, Executive Order and OPM Regulation.**

Contrary to the Government's assertion that CBP had "complete and unfettered discretion to hire Border Patrol agents" in 2006 (USA Mem. Ps. & As. at 11:24 - 25), CBP's authority and discretion to hire federal personnel is strictly circumscribed by an extensive framework of statutes, Executive Orders, and OPM regulations governing employment and hiring of civil servants.  Because both this legal framework and CBP's own internal policy compelled CBP to refer the decision to hire Tackett to OPM due to evidence of dishonesty, the Government's argument that the discretionary function exception defeats Plaintiffs' FTCA claim

---

Moreover, any such argument would fail as a matter of statutory interpretation because the plain language of 5 C.F.R. § 731.101 (2006) states "the purpose of this **part** . . ."  "In construing a statute we must begin, and should often end, with the language of the statute itself.  We apply the canons of construction to regulations as well as to statutes."  *Cremeens v. City of Montgomery*, 602 F.3d 1224, 1226-27 (11th Cir. 2010) (internal citations omitted).  The regulations clearly distinguish between "part" and "subpart" when discussing the scope of a regulation.  For example, subpart C of Part 731 is entitled "OPM Suitability Action Procedures" and includes 5 C.F.R. § 731.301 ("Scope"), which limits the scope only of subpart C: "Coverage. This **subpart** sets forth the procedures to be followed when OPM proposes to take, or instructs an agency to take, a final suitability action against an applicant, appointee or employee."  5 C.F.R. § 731.301(a) (2006) (emphasis added).

1    must fail.

2           Congress enacted numerous statutes regulating the employment of civil

3    service agents in the federal government.[4]   Congress has explicitly delegated

4    authority to the President on issues of hiring personnel and personnel management.

5    *See e.g.* 5 U.S.C. § 3301 ("The President may prescribe such regulations for the

6    admission of individuals into the civil service in the executive branch as will best

7    promote the efficiency of that service"); *Am. Fed'n of Gov't Emps. v. Hoffman*, 543

8    F.2d 930, 938 (D.C. Cir. 1976) ("*Hoffman*"), *citing* 5 U.S.C. § 3301 ("Congress

9    has delegated broad authority to the President to establish the qualifications and

10   conditions of employment for civil servants within the executive branch.").   "The

11   President may delegate, in whole or in part, authority for personnel management

12   functions, including authority for competitive examinations, to the Director of the

13   Office of Personnel Management; and the Director may delegate, in whole or in

14   part, any function vested in or delegated to the Director . . . to the heads of

15   agencies in the executive branch . . ." (5 U.S.C. § 1104(a)).   Congress has further

16   determined that the Office of Personnel Management (OPM) "shall establish

17   standards which shall apply to the activities of the Office or any other agency

18   under authority delegated under subsection (a) of this section."   5 U.S.C. §

19   1104(b)(1).

20          Thus, as an executive branch agency employing civil servants, Customs and

21   Border Protection (CBP) does not operate independently on personnel matters, but

22   is subordinate to Congress, the President, and OPM.   Any authority it has on

23   personnel issues comes from a delegation of such authority by the President or

---

24

25   [4] "[T]he 'civil service' consists of all appointive positions in the executive, judicial,
26   and legislative branches of the Government of the United States, except positions
     in the uniformed services" 5 U.S.C. § 2101(1).   The "uniformed services" refers to
27   the "armed forces, the commissioned corps of the Public Health Service, and the
     commissioned corps of the National Oceanic and Atmospheric Administration."   5
28   U.S.C. § 2101(3).

OPM.

### 1. Background regarding Tackett's "excepted service" position under the Federal Career Intern Program.

The Government is vague in referencing the authority under which CBP hired Tackett in an excepted service position. To demonstrate the inapplicability of certain authority cited by the Government and arguments made by the Government, Plaintiffs provide the following background.

"Federal civil service employees, other than those in the Senior Executive Service, are employed in either the 'competitive service,' 5 U.S.C. § 2102(a)(1) (1982), or the 'excepted service[5].' *Id.* at § 2103(a)." *National Treasury Employees Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988) ("*Horner*"). Congress has delegated authority to the President who may "prescribe rules governing the competitive service. The rules shall provide, as nearly as conditions of good administration warrant, for (1) necessary exceptions of positions from the competitive service. . . ." 5 U.S.C. § 3302. "The President has in turn delegated to OPM authority to 'except positions from the competitive service when it determines that appointments thereto through competitive examination are not practicable.'" *Horner*, 854 F.2d at 492, *citing* Exec. Order No. 10,577, 5 C.F.R. § 6.1(a) (1988).

OPM may, therefore, determine which positions are excepted from competitive service, but the agency is specifically required to adhere to the notice and comment procedures of the Administrative Procedures Act when promulgating rules. *See Horner*, 854 F.2d at 496, *citing* 5 U.S.C. § 1103(b)(1982). Thus, a civil service position may be classified as an "excepted service" position pursuant to OPM's determination, which is subject to the "arbitrary and capricious" standard

---

[5] Applicants to excepted service positions are not required to take a competitive examination. *Horner*, 854 F.2d at 492. "Rather, a variety of more flexible and informal procedures-some established by OPM and others developed by individual agencies-are used to recruit and select new employees into the excepted service." *Id.*

of judicial review.  *Horner*, 854 F.2d at 498.  Or, the President may establish excepted service positions when warranted by "conditions of good administration" pursuant to 5 U.S.C. § 3302(1).  *See Horner*, 854 F.2d at 492.

It is a Presidential executive order which established the excepted service positions under the Federal Career Intern Program, the program under which Tackett was hired.  President Clinton established the Federal Career Intern Program through Executive Order 13162, signed on July 6, 2000.  A person hired successfully through the Federal Career Intern Program occupies an excepted service position.  E.O. 13162, ¶ 4(a).  The President further directed OPM to "prescribe such regulations as it determines necessary to carry out the purpose of this order," *id*. at ¶ 6, and established that "OPM shall provide oversight of the Program."  *Id*. ¶ 7.

In accordance with the presidential directive to establish regulations to carry out Executive Order 13162, OPM promulgated 5 C.F.R. § 213.3202(o), entitled "The Federal Career Intern Program."  5 C.F.R. § 213.3202(o) (2006).  It is clear that Tackett was hired pursuant to Executive Order 13162 and 5 C.F.R. § 213.3202(o) as the regulation section is listed as "Legal Authority" in Tackett's Notification of Personnel Action (USA Exh. I at USA – NOL – 62).

**2. Applying Part 731 to CBP's hiring decisions under the Federal Career Intern Program, including 5 C.F.R. § 731.103(a), advances the statutory goal of having OPM establish and enforce suitability standards for hiring civil servants.**

The validity of any agency's action with respect to hiring personnel and managing its personnel must be first measured against terms of Executive Order authorizing such action and, second, for consistency with the statutory provision under which the Executive Order was promulgated.  *Am. Fed'n of Gov't Emps. v. Hoffman*, 543 F.2d 930, 938 (D.C. Cir. 1976).  *See also Jalil v. Hampton*, 460 F.2d 923, 927 (D.C. Cir. 1972) (regulations which exceed the authority given to it by Executive Order are invalid); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself.").  Applying the requirements of Part 731, including 5 C.F.R. § 731.103(a), to CBP suitability determinations for candidates under Federal Career Intern Program is consistent with controlling authority: (1) 5 U.S.C. § 1104, delegating authority on personnel management to OPM; (2) Executive Order 13162, authorizing the Federal Career Intern Program; and (3) 5 C.F.R. § 213.3202(o), the OPM regulation implementing Executive Order 13162.

Congress' delegation of authority for personnel management to OPM, set forth in 5 U.S.C. § 1104, evidences a desire for OPM to maintain control and enforcement of qualification standards for employment of civil servants in the federal government.  OPM is directed to "establish standards which shall apply to the activities of the Office (OPM) or any other agency under authority delegated under subsection (a) of this section."  5 U.S.C. § 1104(b)(1).  Congress specifically directed OPM to "establish and maintain an oversight program" to police and monitor the delegation of authority on personnel matters to OPM and executive branch agencies.  5 U.S.C. § 1104(b)(2).  And Congress empowered OPM to compel any federal agency, to which OPM delegates authority on personnel matters, to take any corrective action OPM mandates if that agency violates any law, rule, regulation, or standard set by OPM.  5 U.S.C. § 1104(c).

Thus, applying Part 731 to CBP's suitability determinations under the Federal Career Intern Program is consistent with Congress' desire that OPM set the qualification standards for employment of civil servants; that OPM oversee and manage any agency's exercise of delegated authority to hire civil servants; and that OPM police each agency which is delegated authority and enforce the laws, regulations, and OPM standards related to personnel management.  In accordance with Congressional intent, 5 C.F.R. § 731.103(a) should be understood to apply to CBP's hiring policy for civil servants under the Federal Career Intern Program

because it facilitates Congress' objective that OPM set and enforce qualifications and standards for the employment of civil servants.

Moreover, Executive Order 13162, which established the Federal Career Intern Program, is consistent with 5 U.S.C. § 1104(b)(2), because it mandates "OPM shall provide oversight" of the Intern Program.  Exec. Order 13162 at ¶ 7. CBP's incorporation of Part 731 into its hiring policy should be viewed as acting in accordance with 5 U.S.C. § 1104(b)(2) and paragraph 7 of Executive Order 13162. OPM alone had the authority to oversee the Intern Program by making all suitability determinations where there was evidence of material dishonesty. Failing to apply the portion of § 731.103(a) that reserves jurisdiction to OPM in cases of material dishonesty would deprive OPM of its authority to supervise and oversee the Intern Program as mandated both by 5 U.S.C. § 1104(b) and executive order.

Finally, application of 5 C.F.R. § 731.103(a) to CBP suitability determinations for positions under the Federal Career Intern Program is consistent with the requirement of 5 C.F.R. § 213.3202(o)(3) (2006), which governs the Intern Program.  The regulation states as follows: "Qualifications.  Candidates will be evaluated using OPM qualification standards or OPM-approved, agency – specific qualification standards."  5 C.F.R. § 213.3202(o)(3) (2006).  Thus, CBP's policy adopting OPM's suitability standards set forth in Part 731 of Title 5 of the Code of Federal Regulations is best understood as complying with the mandate that candidates hired under the Federal Career Intern Program meet OPM's qualification standards.

### 3.  The OPM Memorandum dated January 14, 2008 (Gov't Exh. J) does not apply to this case.

The Government cites to an OPM Memorandum dated January 14, 2008, which the Government provides as exhibit J (pages USA – NOL – 64 – 72), as authority demonstrating that the suitability requirements of § 731.103(a) did not apply to "excepted service" positions.  But the OPM Memorandum does not apply

here because it refers to positions designated by OPM as "excepted service" positions pursuant to its authority under Executive Order 10577. *See* Exh. J, USA – NOL – 68, "Decision Point 2" under "Applicable Authority" citing E.O. 10577. Executive Order 10577 is the Order through which the President delegated to OPM the authority to establish excepted service positions; these OPM designations of "excepted service" positions are subject to the "arbitrary and capricious" standard of judicial review. *Horner*, 854 F.2d at 492, 498. Thus, the OPM Memorandum does not refer to excepted service positions created under the Federal Career Intern Program by way of executive order.

## IV.
## THE TORT LIABILITY OF PRIVATE EMPLOYERS UNDER CALIFORNIA LAW GOVERNS PLAINTIFFS' NEGLIGENT HIRE CLAIM

### A. A Reasonable Factfinder Could Find the United States Liable for Negligent Hiring Under California Law.

The Government fails to identify and apply the correct legal standard for determining Plaintiffs' fifteenth cause of action under the FTCA for negligent hiring. In claiming that the United States had no duty to Plaintiffs, the Government attempts to apply the standard applicable to municipal entities in California, rather than the legal standard applicable to private parties under California law. In claiming that Tackett's conduct in shooting and killing Valeria was not foreseeable, the Government attempts to impose the Constitutional "deliberate indifference" standard set forth in *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997). But as both the language of the Federal Tort Claims Act and controlling Supreme Court precedent make clear, the applicable legal standard is that which applies to private parties in California.

### 1. The controlling legal standard for Plaintiffs' FTCA negligent hire claim is standard of tort liability imposed on *private employers* under California law.

The Federal Tort Claims Act authorizes claims against the United States, for

the negligent or wrongful acts or omissions of United States' employees, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances . . ." (28 U.S.C. § 2674).

The Supreme Court in *United States v. Olson*, 546 U.S. 43, 44 (2005), citing 28 U.S.C. § 1346(b)(1), stated, "[w]e here interpret these words to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." *Id.* (emphasis in the original). In *Olson*, the Supreme Court reversed a "line of Ninth Circuit precedent" that had permitted courts to determine the liability of the United States under the FTCA by reference to whether the state law made a state or municipal entity liable. *Id.* at 44 – 45. The Court found nothing in the FTCA or the opinions of the Supreme Court to suggest that the waiver of sovereign immunity in the FTCA was premised solely on the absence or existence of municipal or state governmental entity liability under the applicable state law. *Id.* at 46.

As the Supreme Court earlier explained in *Indian Towing Co. v. United States*, 350 U.S. 61, 64 - 65 (1955), courts must look to the state law regulating the conduct of private persons when determining whether the United States is liable under the FTCA for performance of "uniquely governmental functions" that private persons do not perform. *Id.* 64 – 65. The FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA . . ." *Olson*, 546 U.S. 46.

Thus, pursuant to the Court's instruction in *Olson*, the private employer standard of liability for negligent hiring and retention applies to the United States in Plaintiff Estate's FTCA claim. In California, "an employer can be held liable

for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him." *Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828, 843 (3d Dist. 1992), *citing* Rest. 2d Agency, § 213, com. d *and* 53 Am. Jur. 2d. Master and Servant, § 422, pp. 436-437. *Accord Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133, 1139 (4th Dist. 2009) (a private employer "may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit.")(internal citations omitted).

"Negligence liability will be imposed on an employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.'" *Phillips*, 172 Cal. App. 4th at 1139 (citations omitted). "Liability for negligent supervision and/or retention of an employee is one of direct liability for negligence, not vicarious liability." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (6th Dist. 2006). California imposes direct liability upon an employer for negligent hire and retention, not because of the relationship between the parties, but "because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment . . ." *Phillips*, 172 Cal. App. 4th at 1140 (internal quotation omitted). Liability may result if an employer "has not taken the care which a prudent man would in selecting the person for the business in hand." *Id*. (internal quotations omitted).

California has adopted the rule set forth in Restatement Second of Agency section 213. *Evan F.*, 8 Cal. App. 4th at 836. Comment d to section 213 of the Restatement Second of Agency states, in relevant part: an agent "may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . ."

*Phillips*, 172 Cal. App. 4th at 1140 (internal citations, alterations, and quotations omitted).

Plaintiffs' FTCA claim against the United States for negligent screening and hiring of Justin Tackett (their fifteenth cause of action) is premised on extensive material, in the possession of CBP hiring officials, which placed them on notice of Tackett's unfitness to serve as a law enforcement officer.  CBP officials had in their possession the disciplinary notices ICSD issued against Tackett, including the notice of intent to terminate Tackett.  In these notices, ICSD officials, including Sheriff Carter, documented extensive misconduct by Tackett.  Sheriff Carter issued a strongly worded disciplinary notice regarding the probation/parole searches, finding found Tackett had engaged in an elaborate and calculated plan of premediated deception, which consisted of manipulating other law enforcement officer to facilitate his acts of dishonesty.  Sheriff Carter repeatedly admonished Tackett for his dishonesty and lack of candor, and was clearly troubled by Tackett's contempt for rules and laws limiting his authority: "You are not a law unto yourself but no more than an appointed deputy charged with enforcing the laws of the State of California and County of Imperial."  Exh. 4 at BI – 250.

Tackett's abuse of his authority as a law enforcement officer and his belief that he operated outside the confines of the law, including the Fourth Amendment, is a common theme that emerges in the ICSD disciplinary notices.  Undeterred by the lack of a warrant or exigent circumstances, Tackett barges into the Lackey's yard, scales the fence of the Bertussi's home, searches Bertussi's work shop, and enters Bertussi's home to seize his television.  When Lackey wishes to return to his home because he is cold and wearing only blue jeans on a December night, Tackett arrests him.  When Bertussi, while in the privacy of his home, fails to cooperate with Tackett by opening a gate, Tackett scales a wall to arrest Bertussi, then place Bertussi, handcuffed, in a sweltering patrol car to suffer.  When Mrs. Bertussi refuses to let Tackett into her home to seize the big-screen TV, he threatens to

arrest her and prosecute her for a felony crime to secure her acquiescence.  When Tackett dislikes a superior officer's command to cease conducting probation and parole searches, Tackett circumvents his superior officer, embarks on a scheme to conduct the prohibited probation search by manipulating other law enforcement officers, lies when confronted by his superior officer, and then lies again to another superior officer conducting the internal investigation of the incident.

Tackett's use of coercive threats to extract compliance from civilians, punishment of detainees who disagreed with him, utter disregard for the law and contempt for limits on his authority, and pervasive dishonesty were so egregious it prompted Chief Deputy Obeso to write, "I must conclude that no remedy short of your termination can protect our community, this Department and the County's peace officers."  (Exh. 4 at BI -270).  Despite the findings of ICSD authorities, which CBP hiring officials admittedly possessed, they nonetheless chose to believe Tackett and overlooked obvious signs of dishonesty in Tackett's application for federal employment.  They understood Tackett's federal lawsuit as an "appeal" of the ICSD's findings of misconduct.  And though they were aware of the federal lawsuit, and Gomillion stated that one should "[r]efer to the court case for detailed information" (Exh. 7 at BI-020), there is no evidence any CBP hiring official made any attempt to actually investigate the claims in the federal case.  Had Gomillion reviewed Tackett's lawsuit against ICSD on June 30, 2006, he would have seen the motion for summary judgment filed by the Imperial County Sheriff's Department on May 18, 2006, and the thousands of pages of exhibits attached in support of the Department's attempts to terminated Tackett, including the lengthy, extensive independent investigations of the Bertussi and Macias incidences.[6]

Plaintiffs have established an abundance of material facts indicating the United States had reason to know that Tackett was unfit to serve as a law

---

[6] The District Court granted Imperial County's motion for summary judgment as to all causes of action.  Case no. 04-cv-2459, doc. 72.

enforcement officer because of his coercive threats and abuse of detainees. A private employer may be negligent because the employer knows, or has reason to know, that an employee "because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him. If the dangerous quality of the agent causes harm, the principal may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor." *Phillips*, 172 Cal. App. 4th 1140 (internal citations and alterations omitted). Tackett was viewed as a menace and threat to the Imperial County community and Sheriff's Department. CBP hiring officials specifically had information indicating Tackett extensively abused his authority as a law enforcement officer and threatened arrest and prosecution to ensure compliance. Tackett retaliated against individuals by arresting them, and then forced them to suffer while under arrest. As Sheriff Carter observed, Tackett's conduct, operating as he was above the law, was an abuse of the tremendous authority and power entrusted to police officers. CBP officials were placed on notice that if they permitted Tackett to act again as a law enforcement officer, interacting with civilians, there was a likelihood he would use his authority to abuse and threaten civilians. Tackett did precisely that when he sought to arrest Valeria simply because she walked away from him (when he admittedly had no legal basis to detain her), and shot her to death when she had either stopped or sought to move away from him.

2. **The United States' claim that it had no duty to exercise due care in screening and hiring Tackett is premised on inapplicable California caselaw regarding the liability of municipalities and public entities in negligent hire cases.**

Despite caselaw establishing a private employer's potential liability for negligent hire and retention under California law, the United States contends that it had no duty to exercise due care in hiring and retaining Tackett because it had no "special relationship" with Valeria. (USA MSJ at 13 – 14). In making this argument, the United States attempts to analogize its liability to that of

municipalities and California state agencies by relying on *C.A. v. William S. Hart Union High School Dist.*, 53 Cal. 4th 831, 877 (2012).  Although the United States asserts that the "special relationship" standard set forth in *William S. Hart* applies to both public entities and private parties (*see* USA MSJ at 13:27 – 14:2), a review of the case demonstrates that it does not apply to the United States in a FTCA case.

In *William S. Hart*, the California Supreme Court began its analysis by noting the school district could not be directly liable for the negligent hire and retention of a school guidance counselor accused of sexual harassment and abuse pursuant to Cal. Gov. Code § 815.  53 Cal. 4th at 868.  California Government Code section 815 provides that a public entity may not be liable for any injury except as provided by statute.  *Id*.  As no statute permitted the direction imposition of liability on the school district for negligent hire and retention, the issue in *William S. Hart* was whether the school district could be held vicariously liable under Cal. Gov. Code § 815.2 for the negligence of supervisory personnel in hiring and retaining the abusive school guidance counselor.  *Id*. at 869.  Because school personnel have a special relationship with students in their care, the California Supreme Court held employees of school districts have a "duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally."  *Id*. at 870.

The California Supreme Court distinguished a private employer's direct liability for negligent hire and retention from the vicariously liability imposed upon the school district in *William S. Hart*.  53 Cal. 4th at 875.  It noted *Delfino v. Agilent Technologies, Inc*., 145 Cal.App.4th 790, 815 (6th Dist. 2006), and its prior opinion in *Diaz v. Carcamo*, 51 Cal. 4th 1148, 1152 (Cal. 2011), related to an employer's direct liability for negligent hire, retention, and supervision, and did not implicate the vicarious theory of liability discussed in *William S. Hart*.  53 Cal. 4th at 875.  As the *William S. Hart* court observed, the plaintiff's theory of liability in that case did not derive from principals of agency or the relationship between

supervisory school personnel and the subordinate school guidance counselor, but stemmed from school supervisory personnel's own duty of care to the plaintiff, a pupil under their control and supervision.  53 Cal. 4th at 873.

The immunity provided to public entities pursuant to Cal. Gov. Code § 815 renders *William S. Hart* inapplicable to Plaintiffs' FTCA claim.  Unlike the general prohibition on public entity liability set forth in Cal. Gov. Code § 815, the FTCA permits Plaintiffs to hold the United States directly liable for a negligence claim if California law imposes such liability on a private party.  *See* 28 U.S.C. §§ 1346(b), 2674.  As the California appellate court noted in *de Villers v. County of San Diego*, 156 Cal. App. 4th 238, 247 (4th Dist. 2007), a case discussed by the California Supreme Court in *William S. Hart*, there are generally two ways a plaintiff, injured by a tortfeasor, may impose liability on a tortfeasor's employer.  A plaintiff may show:

> (1) the employer violated a duty of care it owed to the injured party and this negligence was a proximate cause of the resulting injury (the *direct* liability theory), or (2) the tortfeasor-employee was liable for committing the tortious conduct that caused the injury while acting within the course and scope of his or her employment (the *vicarious* liability theory).

*de Villers*, 156 Cal. App. 4th at 247 (emphasis in the original).  In order for a plaintiff to recover on a direct liability theory against a California governmental entity, the plaintiff must identify a specific statute rendering the entity liability or imposing a duty of care upon the public entity.  *Id*.  Because no statutory basis existed for imposing direct liability upon a public entity for negligent hire and supervision, the appellate court in *de Villers* held plaintiffs could not seek to hold a public entity directly liable for plaintiffs' negligent hire and supervision claim. 156 Cal. App. 4th at 255 – 256.

Unlike the Federal Tort Claims Act which waives the sovereign immunity of the United States and renders the United States liable for negligent torts, the

California Tort Claims Act distinguishes between the "liability of a public entity based on its own conduct, and the liability arising from the conduct of a public employee." *Zelig v. County of Los Angeles*, 27 Cal. 4th 1112, 1127 (Cal. 2002). A public employee is liable for an injury caused by his act or omission, to the same extent as a private person (Cal. Gov. Code § 820(a)), and when the public employee's act or omission occurs within the scope of employment, the public entity will be vicariously liable for the injury (Cal. Gov. Code § 815.2). *Id*. But the California Tort Claims Act contains no provision providing that a "*public entity* generally is liable for its own conduct or omission to the same extent as a private person or entity. Rather, the Act provides that a public entity is not liable for an injury '[e]xcept as otherwise provided by statute . . ." *Id*., *citing* Cal. Gov. Code § 815 (emphasis in the original).

In stark contrast to the California Tort Claims Act, the Federal Tort Claims Act provides the **United States** is liable to the same extent as a private person or entity. *See e.g.* 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."). The United States has waived sovereign immunity for any injury, caused by the negligent act or omission of a federal government employee in the scope of his employment, "under circumstances where the **United States**, **if a private person**, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (emphasis added). For this reason, the Federal Tort Claims Act "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA in the performance of activities which private persons do not perform." *Olson*, 546 U.S. at 46 (internal citation omitted).

The Government's attempt to analogize this case to the facts of *Koepke v.*

*Loo*, 18 Cal. App. 4th 1444 (1983), is equally unavailing because *Koepke* did not involve an employer's negligence in hiring and retaining an unfit employee. In *Koepke*, the defendant Loo owned a business which employed a man named Logan. *Id.* at 1447. Loo and Logan had a romantic relationship, which eventually terminated. *Id.* Logan later told Loo that he intended to kill the plaintiff Koepke, with whom he had a romantic relationship, and Loo knew that Logan had assaulted Koepke with a gun. *Id.* Loo persuaded Logan to join Alcoholic Anonymous and begin psychiatric treatment. *Id.* Later, Logan shot and grievously wounded Koepke. *Id.* at 1448. The California appellate court rejected the notion that Loo's status as Logan's employer gave rise to a duty to warn Koepke of the danger posed by Logan. *Id.* at 1452. Because Logan's actions were "in no way related to his employment by Loo, the employer-employee relationship which existed between them cannot give rise to a duty." *Id.*

Nor do Plaintiffs allege that Valeria was a victim of a crime and the United States had some duty or obligation to protect her, or warn her, of the danger posed by Tackett. Thus, cases such as *Thompson v. County of Alameda*, 27 Cal. 3d 741 (Cal. 1980), relating to the duty of law enforcement or public entities to warn citizens of potential threats are distinguishable and have no application to this case.

Because California law imposes direct liability on a private employer for negligent hiring if he knows the employee is unfit, has reason to believe the employee is unfit, or fails to use reasonable care to discover the employee's unfitness before hiring him, Plaintiffs have properly alleged a FTCA claim for negligent hire against the United States.

**B. Given Tackett's Extensive History of Retaliatory Arrest, Abuse of Detainees, and Reckless Disregard of the Restrictions of the Fourth Amendment, A Reasonably Prudent Employer Would Have Taken Greater Care in Investigating and Vetting Tackett Before Hiring Him.**

The United States seems to contend that because the Ninth Circuit dismissed Plaintiffs' *Bivens* claim against Stephanie Shavatt for failure to properly screen and

1   hire, pursuant to the *Bryan County v. Brown* deliberate indifference standard, the

2   dismissal of the FTCA claim against the United States is similarly warranted under

3   that standard.  (USA MSJ at p.16).  The Government makes no reference to the

4   appropriate California standard for negligent hire and retention applicable to

5   private employers.  Instead, the Government broadly contends that because Tackett

6   purportedly never engaged in any wrongful conduct involving a firearm prior to

7   being hired by Border Patrol, it was not foreseeable that he would shoot and kill

8   Valeria.  (USA MSJ at p. 18).  Thus, the Government concludes, Plaintiffs cannot

9   establish causation.  But California law for a negligent hire and retention claim

10  against a private employer does not require the same or exact prior incident of

11  employee misconduct to establish foreseeability and demonstrate causation.  The

12  Government's argument is therefore without merit.

13       California does not require a plaintiff to show an employer's actual

14  knowledge of an employee's vicious or dangerous propensities in a negligent hire

15  claim.  *Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828, 843 (3d

16  Dist. 1992).  In *Evan F.*, plaintiff alleged a negligent hire claim against Hughson

17  United Methodist Church, which had hired a pastor, Duane Murphy, who had

18  sexually molested Evan when he was 13-years old.  *Id*. at 831.  Although there was

19  some indication Murphy had sexually molested adolescent boys in the past (*id*. at

20  832), the trial court had granted summary judgment in favor of Hughson Church

21  "because the church 'had no actual knowledge of the history of [Duane] Murphy

22  and did not fail to fulfill any duty owed to plaintiffs.'"  *Id*. at 842.  The California

23  Court of Appeal reversed (*id*. at 843), citing Restatement Second of Agency,

24  section 213, comment d:

25           . . . if a principal, *without exercising due care in
             selection*, employs a vicious person to do an act which
26           necessarily brings him in contact with others while in the
             performance of a duty, he is subject to liability for hard
27           caused by the vicious propensity . . . . [i]f liability results
             it is because, under the circumstances, *the employer has*

28

> *not taken the care which a prudent man would take in*
> *selecting the person for the business at hand. . . .* [*If*] *the*
> *work is likely to subject third persons to serious risk of*
> *great harm, there is a special duty of investigation*."

*Evan F.*, 8 Cal. App. 4th at 842 (emphasis in the original).  The court noted that in California, "an employer can be held liable for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him." *Id*. at 843. Though the church lacked actual knowledge of Murphy's background, the appellate court nonetheless found plaintiffs had raised "triable issues of material fact regarding whether the Church had reason to believe Murphy was unfit or whether the Church failed to use reasonable care in investigating Murphy." *Id*. at 843.

Nor does the absence of a prior similar incident by an employee establish, as a matter of law, the lack of foreseeability in a negligent hire claim. *Nigg v. Patterson*, 233 Cal. App. 3d 171, 188 (3d Dist. 1990).  In *Nigg*, defendant-employer Dennis Patterson hired an employee named Daniel Durrett to work at Patterson's business, The Laundromat. *Id*. at 175.  Durrett had been screened for employment by Stepping Stones, a third-party organization that housed and assisted juvenile offenders about to be released back to the community. *Id*. at 176 – 177.  Later, Durrett beat plaintiff Denise Nigg in the head and face with his fists and a hammer. *Id*. at 175.  Defendant-employer Patterson contended that "it was totally unforeseeable that a resident screened by Stepping Stones as qualified for employment would brutally attack a patron without provocation." *Id*. at 188.  The Court of Appeal declined to hold that Durrett's attack was unforeseeable as a matter of law. *Id*.  "Although there is no indication that Durrett had been involved in prior similar incidents, the lack of such incidents does not by itself negate the element of foreseeability as a matter of law." *Id*.

Foreseeability "is not to be measured by what is more probable than not, but

includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.  One may be held accountable for creating even the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." *Bigbee v. Pac. Tel. & Tel. Co.*, 34 Cal. 3d 49, 57 (Cal. 1983)(internal quotations omitted).  A principal's liability for its own negligence in hiring, training, retaining, or supervising an agent requires "some nexus or causal connection between the principal's negligence in selecting or controlling an actor, the actor's employment or work, and the harm suffered by the third party." *Phillips*, 172 Cal. App 4th at 1140, *citing* Rest. 3d Agency, § 7.05, com. c, illus. 5, p. 180.

Here, Plaintiffs have shown a nexus between the harm Valeria suffered and the United States' failure to adequately investigate and screen Tackett for work as a federal law enforcement officer by establishing that CBP officials possessed information indicating Tackett's extensive abuse of his authority as a Sheriff's deputy.  CBP officials were aware of Tackett's likelihood to abuse his position to make retaliatory arrests, abuse arrestees, and make coercive threats to intimidate civilians because that was the basis for ICSD's decision to terminate Tackett.  CBP officials' failure to engage in any further investigation, such as their failure to even review ICSD's motion for summary judgment and supporting exhibits, or simply interview Sheriff Carter, is particularly striking because they were aware of the civil lawsuit and were aware of ICSD's attempt to terminate Tackett for misconduct.

## V.
## THE UNITED STATES' LIABILITY UNDER THE FTCA IS NOT MERELY VICARIOUS OR DERIVATIVE OF TACKETT'S LIABILITY.

The United States contends that because Tackett is allegedly entitled to qualified immunity for Plaintiffs' Bivens claims, Plaintiffs' FTCA claims must similarly fail, and thus, "the Court should dismiss Plaintiffs' vicarious liability claims against the United States at this juncture."  (USA MSJ at 22:9 – 12).

Whether Tackett is entitled to qualified immunity for his conduct under color of law has no bearing on the United States' liability under the FTCA because the private person standard applies to the United States.  The Government then appears to suggest that if immunity is available to Tackett, the United States would be absolved of liability, again citing to cases referring to the vicarious liability of municipalities, police officers, and police agencies under California law.  *See e.g. Rodarte v. Alameda Cnty*., 2014 U.S. Dist. LEXIS 129399, *41 (N.D. Cal. 2015) and cases cited at USA Mem. Ps. & As. at 21:21 – 22:4.

But state laws of immunity, available to state governmental actors and state agencies, are unavailable to the United States in a FTCA action.  *United States v. Muniz*, 374 U.S. 150, 164 (1963).  In *Muniz*, the Court refused to defeat Congress' waiver of sovereign immunity by imposing state rules of immunity to restrict FTCA claims: "[j]ust as we refused to import the 'casuistries of municipal liability for torts' in *Indian Towing*, so we think it improper to limit suits by federal prisoners because of restrictive state rules of immunity."  *Id*. at 164.  The purpose of the Federal Tort Claims Act is to provide relief to those who have suffered injury due to the wrongdoing of a government employee.  *Id*. at 165.  "We should not . . . narrow the remedies provided by Congress.  As we said in *Rayonier, Inc*., v. *United States, supra*, at 320, 'There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it.'"  *Id*. at 165 – 166, *citing Rayonier, Inc., v. United States*, 352 U.S. 315, 320 (1957).

The Government's argument that Fourth Amendment objective reasonableness standard applies to Plaintiffs' FTCA claims for negligence and battery is similarly inconsistent with the private person standard of 28 U.S.C. § 1346(b)(1) as enunciated by the Supreme Court in *Indian Towing*, *Olson*, and *Muniz*.  A determination of reasonableness under the Fourth Amendment requires balancing the governmental interest at stake against the intrusion on an individual's

Fourth Amendment's interests: "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted).  In a private person battery action, there would be no consideration of the any governmental interest or any intrusion on the Fourth Amendment because no government interest, or Fourth Amendment interest, would apply to private parties.

Nor does the Fourth Amendment standard apply to Plaintiffs' FTCA claims simply because this case involves the actions of a federal officer for which there is no private analogue.  In *Olson*, the Court instructed lower courts to "look further afield" to find the closest private analogue for performance of uniquely governmental functions: "[t]he Act makes the United States liable 'in the same manner and to the same extent as a private individual under *like circumstances.*' As this Court said in *Indian Towing*, the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield." *Olson*, 546 U.S. at 46 (internal citations omitted)(emphasis in the original).  The United States makes no argument about the viability of Plaintiffs' claims under the California tort standard for private parties.  It provides no analysis of similar or analogous California tort law.  Having failed to make such an argument in its motion, the United States has forfeited its right to move for summary judgment on the balance of Plaintiffs' FTCA claims.  *Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990) (party cannot raise a new issue for the first time in a reply brief).

///

///

///

///

///

1        Based on the foregoing, Plaintiffs respectfully move this Court to deny the

2  United States' motion for summary judgment.

3

4                                    Respectfully submitted,

DATED: February 6, 2018         IREDALE & YOO

5

6                                 *s/ Grace Jun*

7                                 EUGENE G. IREDALE

                                  JULIA YOO

8                                 GRACE JUN

                                 Attorneys for Plaintiffs

9                                 ESTATE OF VALERIA TACHIQUIN

                                 ALVARADO et al.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28