# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF VALERA
TACHIQUIN ALVARADO, et al.,

                                                    Plaintiffs,

v.

JUSTIN TACKETT, et al.,

                                                    Defendants.

Case No.:  13-CV-1202 W (JMA)

**ORDER:**

**(1) GRANTING IN PART AND
DENYING IN PART DEFENDANT
JUSTIN TACKETT'S MOTION FOR
SUMMARY JUDGMENT [DOC. 122];
AND**

**(2) GRANTING IN PART AND
DENYING IN PART DEFENDANT
UNITED STATES' MOTION FOR
SUMMARY JUDGMENT [DOC. 124]**

        Pending before the Court are: (1) a motion for summary judgment filed by
Defendant Justin Tackett [Doc. 122]; and (2) a motion for summary judgment filed by
Defendant United States of America.  [Doc. 124.]  Plaintiffs oppose.  [Docs. 128, 132.]
The Court decides the matters on the papers submitted without oral argument pursuant to
Civil Local Rule 7.1(d)(1).  For the reasons discussed below, the Court **GRANTS IN
PART AND DENIES IN PART** both motions.

//

//

## I.     **Background**

Viewed in the light most favorable to the Plaintiffs, the facts are as follows.

On Friday, September 28, 2012, a team of six Customs and Border Protection ("CBP") agents including Agents Justin Tackett and Alex Roozen traveled to 615 Moss Street in Chula Vista, California to conduct a "knock and talk." (*Tackett Joint Statement of Undisputed Facts* [Doc. 142] ¶ 1.)  Their objective was to arrest Ricardo Ibarra, a previously deported alien whom they believed was residing at that location.  (*Id.*)  The agents were in plainclothes and had no warrant.  (*Id.* [Doc. 142] ¶ 2; *Pls.' Disputed Facts* [Doc. 142] ¶ 1.)

When they arrived at the address, the agents had badges displayed that made it clear they were law enforcement.  (*Gutierrez Depo.* [Doc. 122-13, Exh. K] 15:3–11; *Diaz Depo.* [Doc. 122-5, Exh. C] 55:16–20; *Lindberg Depo.* [Doc. 122-4, Exh. B] 63–64; *Frando Depo.* [Doc. 122-12, Exh. J] 18–19.)[1]  Agent Tackett was the exception in this regard, who had obscured his badge on his belt.  (*Tackett MSJ* [Doc. 122-1] 3:21–22; *Tackett Interview* [Doc. 122-8, Exh. F] 9–10.)  They identified themselves as law enforcement when Ms. Erica Herrera opened the door of Ibarra's apartment.  (*Lindberg Depo.* [Doc. 122-4, Exh. B] 62:8–63:19.)

After the agents had a brief conversation with Herrera, Tachiquin walked out of the master bedroom.  (*Lindberg Depo.* [Doc. 122-4, Exh. B] 69.)  She came to the door.  She told the agents that Ibarra was taking a shower, and they asked her to let him know they were there to speak with him.  She went back into the bedroom.  (*Id.*)  She came back out

---

[1] Plaintiffs dispute this fact with a citation to page 28 of the deposition of Antonio Cacho.  (*Pls.' Disputed Facts* [Doc. 142] ¶ 1 (citing "Cacho Depo, 28:14–29:12" (omitting any docket citation)).)  Their lodgment does not contain this page, and Defendants have not filed it with the Court.  (*See Cacho Depo.* [Doc. 133-19, Exh. 17]; *Cacho Depo.* [Doc. 122-6, Exh. D].)  The same pattern repeats itself with their citation to the Ibarra deposition.  (*Pls.' Disputed Facts* [Doc. 142] ¶ 1 (citing "Ibarra Depo, 19:2–8).)  This deposition is not part of Plaintiffs' lodgment at all, and Defendants have not filed page 19.  (*Ibarra Depo.* [Doc. 122-3, Exh. A].)

a minute or two later.  The agents asked for her name, which she did not provide.  Tackett testified that he accused Tachiquin of trespassing:

> **I believe I informed [Tachiquin] that we're trying to find out if she has a right to be there.  And that since there was items being moved from the residence and being that she is saying she didn't live there, so I believe in between her inside, the communication, I overheard them saying that they didn't live there.**
>
> **She said -- basically I was informing her that she didn't have a right to be there, and if she was removing items she could be trespassing.  If she didn't have permission to be there, she could be stealing items that are inside.  And I then asked one of the other agents to get the property manager to come down."**

(*Tackett Depo.* [Doc. 122-7, Exh. E] 260:3–14.)  Herrera asked if the agents had a warrant, and the agents answered no.  (*Herrera Depo.* [Doc. 122-11, Exh. I] 26–27.)  Herrera and Tachiquin shut the door.  (*Lindberg Depo.* [Doc. 122-4, Exh. B] 70–71.)

Tachiquin left the apartment soon thereafter.  (*Lindberg Depo.* [Doc. 122-4, Exh. B] 84–85.)  Agent Lindberg directed Agent Tackett either to identify or to follow her.  (*Id.* [Doc. 122-4, Exh. B] 84–85; *Tackett Depo.* [Doc. 122-7, Exh. E] 271.)  Agents Tackett and Roozen followed her, with Tackett repeatedly calling after her, "Ma'am."  (*Tackett Depo.* [Doc. 122-7, Exh. E] 271–72; *Roozen Depo.* [Doc. 122-10, Exh. H] 47.)  Tachiquin ignored Tackett, hurried to her car, then got in.  (*Tackett Depo.* [Doc. 122-7, Exh. E] 272–74.)  Tackett stood just off the front left fender of Tachiquin's car, which was parked parallel on the north side of Moss Street, to read the license plate over the phone to Border Patrol Communications.  (*Id.* [Doc. 122-7, Exh. E] 274, 282; *Roozen Depo.* [Doc. 122-10, Exh. H] 57–60.)

Tachiquin backed her car up in order to make room so as to leave.  (*Tackett Depo.* [Doc. 122-7, Exh. E] 275.)  The car hit Tackett at a slow rate of speed.  (*See Tackett Depo.* [Doc. 122-7, Exh. E] 282–83, 297–98.)  Roozen testified that at first he did not see the car hit Tackett, but that "[i]t looked like . . . he was . . . being pushed off balance."  (*Roozen Depo.* [Doc. 122-10, Exh. H] 60–61.)  He testified that Tackett made a motion with his hips, legs, and arms indicating that "he was trying to maintain or get his balance."  (*Id.* [Doc. 122-10, Exh. H] 61.)

Tackett, who was on the phone with the Border Patrol at the time, called out that Tachiquin was "going to jail."

> **Tackett: You just assaulted an agent. Now you are going to jail.**
> **Tackett: Did you see it at all?**

(*Tackett Transcript* [Doc. 122-17, Exh. O]; *Roozen Depo.* [Doc. 122-10, Exh. H] 61–62.) He continued reading Border Patrol Communications her license plate number. (*Tackett Transcript* [Doc. 122-17, Exh. O].)

At this point, Tachiquin drove the car forward and then back again a second time, impacting Tackett's legs. (*Roozen Depo.* [Doc. 122-10, Exh. H] 63–67.) Tackett once again told Tachiquin that she just assaulted him and that she was "going to jail." (*Tackett Transcript* [Doc. 122-17, Exh. O]; *Roozen Depo.* [Doc. 122-10, Exh. H] 68.) He then instructed Agent Roozen:

> **Tackett: Crack her window if she starts to move bro. Keep your weapon up.**
> **Roozen: You got it man.**

(*Tackett Transcript* [Doc. 122-17, Exh. O].)

Tackett called out to a witness who was walking by at the time, telling him, "[d]on't worry about it," and "[k]eep walking." (*Tackett Transcript* [Doc. 122-17, Exh. O].) He said to this witness, "[y]ou see her moving this way right now[,]" and "[l]ook at her moving forward." (*Id.*; *Roozen Depo.* [Doc. 122-10, Exh. H] 68–69.) According to Roozen's testimony, "this person acknowledged Tackett, but said something along the lines of, 'I didn't see anything. I don't know what you're talking about.'" (*Roozen Depo.* [Doc. 122-10, Exh. H] 68–69.)

The car moved forward a third time. (*Roozen Depo.* [Doc. 122-10, Exh. H] 70.) It struck Tackett again. (*Tackett Depo.* [Doc. 122-10, Exh. E] 301.) Tackett directed Roozen to break the driver's side window:

> **Tackett: See right now your car hit me again.**
> **Tackett: Just crack the window bro. She keeps running into me. Crack the**
> **window. Crack it.**

4

(*Tackett Transcript* [Doc. 122-17, Exh. O].)  At this point, Roozen smashed the car's driver side window with a knife that had a tungsten glass break on it. (*Roozen Depo.* [Doc. 122-10, Exh. H] 71–72.)  Roozen reached into the car to try to switch off the ignition, but Tachiquin accelerated away.  (*Id.* [Doc. 122-10, Exh. H] 72–75.)  The car impacted Tackett, sending him onto the hood and the windshield.[2]  (*Tackett Depo.* [Doc. 122-7, Exh. E] 310–16; *Roozen Depo.* [Doc. 122-10, Exh. H] 75–78.)

The car sped off down the road with Tackett on the hood.  (*Tackett Depo.* [Doc. 122-7, Exh. E] 314–317; *Roozen Depo.* [Doc. 122-10, Exh. H] 76–84; *Vargas Depo.*  [Doc. 122-19, Exh. Q] 30–35.)  With Tackett sprawled across the front of her car, Tachiquin accelerated in an attempt to get around another driver on the road, Mr. Vargas, who tried to slow her down upon seeing Tackett.  (*Vargas*

---

[2] Plaintiffs' opposition brief contends that Tackett "leap[ed]" onto the hood of the car. (*Tackett MSJ Opp'n* [Doc. 132] 6:10–22; *Pls.' Disputed Facts* [Doc. 142] ¶ 12.)  The only evidence to support this assertion is the testimony of Mr. Daniel Frando that an unidentified eyewitness known only as "Rooster" told him that Tackett jumped onto the car. (*Pls.' Disputed Facts* [Doc. 142] ¶ 12; *Frando Depo.* [Doc. 133-5] 56:24–57:10.)  As Defendants point out in reply, Rooster has never been identified, has never been subject to deposition, and Frando's testimony on this matter is inadmissible hearsay. (*Tackett MSJ Reply* [Doc. 141] 6–7.)  See Fed. R. Evid. 801–02.  Plaintiffs argue that there should be a later opportunity to brief the matter of this testimony's admissibility—that it should be admitted for the purposes of the pending summary judgment motion based on nothing more than counsel's bare representations that the excited utterance or residual exceptions may apply at a later date. (*Pls.' Disputed Facts* [Doc. 142] ¶ 12.)  The decision on the evidence's admissibility must be made now.  And based on what is now before the Court, the exceptions Plaintiffs identify are inapplicable.

Plaintiffs further argue that Tackett's testimony that he could not remember suffering any abrasions, broken bones, or bruises on his legs is itself sufficient to create a genuine dispute as to whether Tackett leaped onto the car. (*Pls.' Disputed Facts* [Doc. 142] ¶ 12; *Tackett Depo.* [Doc. 122-7, Exh. E] 286–312.)  It is not.  Tackett testified that after the incident he "complained of pain in [his] left side, which consisted of [his] leg[,]" but that he couldn't recall if he specifically complained of leg pain. (*Tackett Depo.* [Doc. 122-7, Exh. E].)  He further testified that he suffered internal bleeding after the incident. (*Tackett Depo.* [Doc. 122-7, Exh. E] 288–289.)  Without more, the Court cannot draw the inference that these injuries were inconsistent with the impact Tackett and Roozen testified to witnessing—especially if the car started out in close proximity to Tackett's body.  Both Roozen and Tackett testified, in no uncertain terms: (1) that the car struck Tackett; and (2) that Tackett did not jump onto the car. (*Tackett Depo.* [Doc. 122-7, Exh. E] 308; *Roozen Depo.* [Doc. 122-10, Exh. H] 76.)  Plaintiffs provide nothing that could give rise to a genuine dispute as to this point.

*Depo.* [Doc. 122-19, Exh. Q] 33:2–11 ("[H]e was on top, on the hood of a car that was moving, trying to hang on for his life. And that's the main reason why I tried to slow them down. Tried to slow my speed and control her speed so that she wouldn't speed up anymore.") When Mr. Vargas slowed from 20–25 to 15 miles per hour, Tachiquin crossed into the oncoming lane of traffic. (*Id.* [Doc. 122-19, Exh. Q] 30:4–7; 33:16–34:3; *Hoyos Depo.* [Doc. 122-18, Exh. P] 28:22–29:3.) Tackett struggled to maintain his balance on the hood. (*Vargas Depo.* [Doc. 122-19, Exh. Q] 34:22–23; *Flores Depo.* [Doc. 122-20, Exh. R] 21:22–24.) Tackett called out for Tachiquin to stop. (*Hoyos Depo.* [Doc. 122-18, Exh. P] 32; *Tackett Depo.* [Doc. 122-7, Exh. E] 314.) From the oncoming traffic lane, Tachiquin turned onto another street. (*Vargas Depo.* [Doc. 122-19, Exh. Q] 36:14–16.)

There is no dispute that Tackett then fatally shot Tachiquin. (*See Tackett MSJ* [Doc. 122-1] 9:4–11:16; *Pls.' Opp'n* [Doc. 132] 7:10–9:17.) The dispute centers around the circumstances under which the shooting began.

Tackett testified that he was on the hood itself when he fired the first shot. (*Tackett Depo.* [Doc. 122-7, Exh. E] 318–20.) Eyewitnesses Monica Hoyos, Patti Ashby, and Jose Vargas all testified that the gunshots began while Tackett was on the hood. (*See Hoyos Depo.* [Doc. 122-18, Exh. P] 37:7–10; Ashby Depo. [Doc. 122-25, Exh. U] 27:7–12; *Vargas Depo.* [Doc. 122-19, Exh. Q] 38.)

However, eyewitness Roberto Flores testified that Tackett was standing when he began firing. (*Flores Depo.* [Doc. 122-20, Exh. R] 44:8–15.) Plaintiffs cite to the deposition of Ashley Guilbeau for the proposition that Guilbeau "heard gunshots and saw Tackett standing in front of the Honda . . . walking towards the

6

front of the car once the car stopped at Oaklawn." (*Tackett MSJ Opp'n* [Doc. 132] 6:10–7:20.)[3]

The shooting ended with Tackett standing towards the front-right fender of Tachiquin's car, having fired ten bullets through the car's windshield. (*See Tackett Depo.* [Doc. 122-7, Exh. E] 323–327; *Martini Expert Report* [Doc. 122-31, Exh. AA] 11; *Haag Expert Report* [Doc. 122-23, Exh. T] 33.) Tachiquin was hit repeatedly and died from her injuries. (*Martini Expert Report* [Doc. 122-31, Exh. AA]; *Haag Expert Report* [Doc. 122-22, Exh. T].)

Tachiquin's autopsy revealed a blood methamphetamine concentration of 0.10 mg/L—a concentration consistent with recreational use, and also consistent with Tachiquin being under the influence of methamphetamine during the events that lead to her death. (*Kalish Expert Report* [Doc. 122-30, Exh. Z].)

The Second Amended Complaint ("SAC") asserts eighteen causes of action: (1) unlawful stop against Agents Tackett and Roozen pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971); (2) illegal detention against Agents Tackett and Roozen pursuant to Bivens; (3) illegal arrest against Agents Tackett and Roozen pursuant to Bivens; (4) excessive force against Agents Tackett and Roozen pursuant to Bivens; (5) unlawful seizure against Agent Tackett pursuant to Bivens; (6) illegal use of Deadly Force against Agent Tackett pursuant to Bivens; (7) wrongful death against Agent Tackett pursuant to Bivens; (8) violation of the right of association against

_____

[3] Ashley Guilbeau testified that from her apartment she saw Tachiquin drive eastward (not westward, as Plaintiffs concede she did (*Tackett MSJ Opp'n* [Doc. 132] 7:1)), and that she saw Tackett walk up from behind Tachiquin's car before the shooting. (*Guilbeau Depo.* [Doc. 122-26, Exh. V] 61.) Guilbeau testified that she had "heard [Tachiquin] was followed" before the shooting took place and that she had "assumed" that Tackett must have gotten out of another car. (*Id.* [Doc. 122-26, Exh. V] 129.) Nowhere does she state the basis for this assumption, or where she heard this information. Her testimony that Tackett started out to the rear of Tachiquin's car is inconsistent with Plaintiffs' theory of the case. (*Pls.' Opp'n* [Doc. 132] 6:10–7:23 ("Tackett Leaps onto the Hood of Valeria's Car."); *Pls.' Disputed Facts* [Doc. 142] ¶ 13 ("[Tachiquin] then voluntarily stopped the car to allow Tackett to remove himself, shifted the gear into reverse, and retreated.").) It is also inconsistent with every other piece of evidence. No reasonable jury could rely on it. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

Agent Tackett pursuant to <u>Bivens</u>; (9) failure to properly screen and hire against Defendant Shavatt pursuant to <u>Bivens</u>; (10) assault against the United States, Tackett, and Roozen; (11) battery against the United States, Tackett, and Roozen; (12) battery against the United States and Tackett; (13) battery through the use of deadly force against the United States and Tackett; (14) negligence against the United States, Tackett, and Roozen; (15) negligent screening and hiring against the United States and Shavatt; (16) false imprisonment against the United States, Tackett, and Roozen; (17) wrongful death pursuant to California Code of Civil Procedure § 377.6 against the United States and Tackett; and (18) violation of Cal. Civ. Code § 52.1 against the United States and Tackett. (*SAC* [Doc. 50].)

On April 27, 2015, the Court granted Defendant Roozen's motion to dismiss claims one, two, three, and four against him. (*April 27, 2015 Order* [Doc. 103.) Per a Ninth Circuit mandate, all claims against Defendant Shavatt were dismissed on August 24, 2017. (*Aug. 24, 2017 Order* [Doc. 120]; *Ninth Cir. Mandate* [Doc. 115].)

Claims one through eight, ten through fourteen, and sixteen through eighteen against Defendant Tackett remain, as do claims ten through eighteen against the United States and claims ten, eleven, fourteen, and sixteen against Defendant Roozen. (*SAC* [Doc. 50].)

Defendant Tackett moved for summary judgment on December 18, 2017. (*Tackett MSJ* [Doc. 122].) Defendant United States of America joined in Tackett's motion [Doc. 123] and also filed its own motion for summary judgment on December 21, 2017. (*USA MSJ* [Doc. 124].) Plaintiffs oppose both motions. (*Tackett MSJ Opp'n* [Doc. 132]; *USA MSJ Opp'n* [Doc. 128].)

## II.   <u>Legal Standard</u>

Summary judgment is appropriate under Rule 56 when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

8

(1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this "burden of production" in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. See id. at 322–25; Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000) (explaining relevant burden-shifting terminology). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the Court is not obligated "to scour the record in search of a genuine issue of triable fact . . . ." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden of production on the motion, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,'

9

designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. Anderson, 477 U.S. at 255.

## III. Discussion

### A. Tackett's Motion

#### 1. Pre-Shooting Seizures

#### (First, Second, Third, Fourth, and Fifth Claims for Relief)

The Court held in its April 27, 2015 order that Defendant Roozen did not seize Tachiquin during their encounter prior to the shooting. (*Apr. 27, 2015 Order* [Doc. 103] 11–12.) In reversing this Court's decision on a separate issue as to Defendant Shavatt, the Ninth Circuit held that "[t]o the extent that Plaintiffs frame their claim as a challenge to the pre-shooting seizure of Tachiquin, that argument fails because they have not adequately alleged that a pre-shooting seizure occurred." (*Ninth Cir. Memo. Opinion* [Doc. 115] 3.) Plaintiffs have not subsequently amended the operative SAC.

Tackett argues that the same reasoning as to the failure to properly allege a pre-shooting seizure should apply to him, and that as a result, he is entitled to summary judgment on the first through fifth causes of action. (*Tackett MSJ* [Doc. 122-1] 1:22–2:11.) The argument is very brief. It appears in the motion's introduction. But Plaintiffs do not address it anywhere in their opposition. (*Tackett MSJ Opp'n* [Doc. 132].) As such, Plaintiffs appear to concede the merits of the argument and acquiesce in summary judgment as to the first five claims against Agent Tackett—all of which explicitly allege pre-shooting seizures in violation of the Fourth Amendment. (*SAC* [Doc. 50] ¶¶ 185–212.) Indeed, the first four of these causes of action are the very same the Court

10

previously dismissed as against Agent Roozen.  (*Id.* [Doc. 50] ¶¶ 185–205; *Apr. 27, 2015 Order* [Doc. 103] 10–13, 20.)  The fifth alleges a violation of the Fourth Amendment through Tackett "jump[ing] onto the hood of [Tachiquin's] car[.]"[4]  (*SAC* [Doc. 50] ¶¶ 206–212.)

Consistent with the Court's reasoning in April of 2015 and the Ninth Circuit's reasoning in March of 2017, there is no genuine dispute that Tachiquin was never seized prior to the shooting.  (*Apr. 27, 2015 Order* [Doc. 103] 10–13, 20; *Ninth Cir. Memo. Opinion* [Doc. 115] 3.)

Defendant Tackett's motion for summary judgment on Plaintiffs' first through fifth causes of action will be granted.

### 2.    Fourth and Fifth Amendment Liability for the Shooting (Sixth, Seventh, and Eighth Causes of Action)

#### a)    Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct ' does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (internal quotation omitted)).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " <u>Id.</u> (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012) (internal quotation omitted)). There need not be a case directly on point, but " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " <u>Id.</u> (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011))  "[Q]ualified immunity protects 'all but the plainly

---

[4] As discussed in footnote 2, *supra*, there is no evidence that could give rise to a genuine dispute that Tackett jumped onto the car.

incompetent or those who knowingly violate the law.' " Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' " Id. (quoting al-Kidd, 563 U.S. at 742). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)) (internal quotation omitted). "Such specificity is especially important in the Fourth Amendment context, where the [Supreme Court of the United States] has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.' " Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

" '[The Supreme Court of the United States has] repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.' " City & Cty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1775–76 (2015) (quoting al-Kidd, 563 U.S. at 742)). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018)[5] (quoting Mullenix, 136 S. Ct. at 309). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." Id. (quoting Mullenix, 136 S. Ct. at 309).

//

//

---

[5] Kisela was issued on April 2, 2018, after this motion was briefed. 138 S. Ct. 1148. Defendant Tackett filed a notice of supplemental authority bringing the case to the Court's attention. (*Def.'s Notice of Supp. Authority* [Doc. 154].) Plaintiffs did not object.

12

### b) Fourth Amendment—Excessive Force

Allegations of excessive force by law enforcement are analyzed using the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. 386, 395 (1989). "As in other Fourth Amendment contexts . . . , the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. The inquiry is a highly fact-specific one. Id.; see Scott v. Harris, 550 U.S. 372, 381–83.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' Bell v. Wolfish, 441 U.S. 520, 559 . . . (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including[:] [1] the severity of the crime at issue[;] [2] whether the suspect poses an immediate threat to the safety of the officers or others[;] and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

"Where [a law enforcement officer] has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Garner, 471 U.S. at 11. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

### c) Fifth Amendment—Substantive Due Process

" '[T]he touchstone of due process is protection of the individual against arbitrary action of government[.]' " <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 845 (1998) (quoting <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974)). "Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]' " <u>Id.</u> at 846 (quoting <u>Collins v. Harker Heights</u>, 503 U.S. 115, 129 (1992)).

"The police on an occasion calling for fast action have obligations that tend to tug against each other . . . . [t]heir decisions have to be made 'in haste, under pressure and frequently without the luxury of a second chance.' " <u>Lewis</u>, 523 U.S. at 853 (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986)). "[I]n such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."[6] <u>See id.</u> at 836.

### d) Analysis

The Court need not and does not decide whether Agent Tackett violated Tachiquin's Fourth or Fifth Amendment rights. <u>See</u> <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2020 (2014) (explaining that use of the two-step analytical framework of <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001) is now discretionary per <u>Pearson v. Callahan</u>, 555 U.S.

---

[6] Plaintiffs argue for the application of a different standard—one applicable "when officials have time to make unhurried judgments." (<i>Pls.' Opp'n</i> [Doc. 132] 27:5–29:20 ("Tackett did not have to act 'in haste, under pressure' as [did] the officers in <u>Lewis</u>."); ("There was no 'fast action' or high speed chase in this case."); ("This was a 'slow action' event . . . .").) This is not persuasive.

Tachiquin drove her car into Tackett and then accelerated around traffic into the wrong-way lane of a public street with him sprawled across the hood of her car. (<i>Tackett Depo.</i> [Doc. 122-7, Exh. E] 314–317; <i>Roozen Depo.</i> [Doc. 122-10, Exh. H] 76–84; <i>Vargas Depo.</i> [Doc. 122-19, Exh. Q] 30; 33–34; <i>Flores Depo.</i> [Doc. 122-20, Exh. R] 22:15–20; <i>Hoyos Depo.</i> [Doc. 122-18, Exh. P] 28:22–29:3.) The evidence leaves no room for genuine dispute that his subsequent decision to use lethal force was made "in haste" and "under pressure." <u>See</u> <u>Lewis</u>, 523 U.S. 853.

223, 227 (2009)).  Any such rights were not clearly established at the time.  See Mullenix, 136 S. Ct. at 308.

By the time Agent Tackett fatally shot Tachiquin, he had been impacted by a car with so much force as to propel him onto the hood of the accelerating vehicle, damaging the windshield.  (*Tackett Depo.* [Doc. 122-7, Exh. E] 310–11; *Haag Expert Report* [Doc. 122-23, Exh. T] 19.)  He stayed on the hood as the car accelerated into the road and around Mr. Vargas' automobile, driving the wrong way into the oncoming traffic lane. (*Tackett Depo.* [Doc. 122-7, Exh. E] 314–317; *Roozen Depo.* [Doc. 122-10, Exh. H] 76–84; *Vargas Depo.* [Doc. 122-19, Exh. Q] 30–35.)  Tachiquin ignored his commands to stop as he gripped the sides of hood, struggling to maintain his balance.  (*Hoyos Depo.* [Doc. 122-18, Exh. P] 32; *Tackett Depo.* [Doc. 122-7, Exh. E] 314; *Vargas Depo.* [Doc. 122-19, Exh. Q] 33–34.)  When it finally came to a stop 773 feet away (*Joint Statement of Undisputed Facts* [Doc. 142] ¶ 8), Tackett was faced with a split-second decision as to how to prevent the driver—who had already proven she was willing to endanger his life—from running him over.  His decision to use lethal force was not plain incompetence or knowing violation of the law.  See Mullenix, 136 S. Ct. at 308.

As the Supreme Court put it in Kisela, "[t]his is far from an obvious case in which any competent officer would have known that shooting [Tachiquin] to protect [Tackett] would violate" a constitutional right.  Kisela, 138 S. Ct. at 1153.  On the contrary, had Tackett hesitated, there would have been nothing to stop Tachiquin from using her car as a weapon yet again and simply running him down once he was off the hood.  She had already demonstrated a willingness to at the very least risk his life (if not try to end it), and she was still in control of a deadly weapon—her car.  Even if Tackett had come off the hood (which the Court infers for the purpose of deciding this motion, Matsushita, 475 U.S. at 587), this does not change the fact that she still posed a deadly threat to him.

Plaintiffs argue that the Ninth Circuit opinions of Adams v. Speers, 473 F.3d 989 (9th Cir. 2007) and Acosta v. City and County of San Francisco, 83 F.3d 1143 (9th Cir. 1996) constitute clearly established law that Tackett violated the Fourth Amendment by

shooting Tachiquin.  (*Tackett MSJ Opp'n* [Doc. 132] 22–27.)  They are wrong.  Neither of these cases involved a suspect who had intentionally endangered the life of a law enforcement officer as Tachiquin did.  Plaintiffs' representation that "[Tachiquin] never threatened anyone and never showed any indication that she intended to hurt anyone" is simply not consistent with the facts.  (*Pls.' Opp'n* [Doc. 132] 24:4–5.)  Neither is Plaintiffs' assessment that "[Tachiquin] did not pose any immediate threat of death or serious bodily injury to Tackett[.]"  (*Id.* [Doc. 132] 21:2–3.)  The undisputed evidence shows that Tachiquin had just accelerated into a public street and around traffic into the wrong-way lane with Tackett clinging to the hood.  She had already demonstrated that she had no problem using her vehicle as a weapon and risking his death or serious injury. And she was still behind the wheel.

In the mere seconds that Tackett had to consider how best to end the threat to his life, he had no way of knowing whether Tachiquin would try to accelerate at him again. She had just done so a few moments before and she had rejected earlier opportunities to safely pull over—instead opting to endanger his life.  Plaintiffs speculate that Tackett had "less intrusive alternatives to deadly force"—"either [staying] where he was as [Tachiquin] stopped her car or [moving] further to the side of the car."  (*Pls.' Opp'n* [Doc. 132] 21:14–22:2.)  They cite to no evidence, and Tackett would have had every reason to believe these ostensible alternatives would have exposed him to mortal danger. Agent Tackett is immune from liability unless he was plainly incompetent or knowingly violated the law.  <u>See</u> <u>Mullenix</u>, 136 S. Ct. at 308.  There is no genuine dispute that was not the case here.

Tackett is immune and is entitled to summary judgment on the constitutional claims on that basis.

//

//

//

//

### 3. Remaining State-Law Claims Against Tackett
### (Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Sixteenth,
### Seventeenth, and Eighteenth Causes of Action)

Defendant Tackett's Notice of Motion requests summary judgment (not partial summary judgment), but his points and authorities do not address the remaining state-law causes of action against him.  (*Tackett MSJ Notice* [Doc. 122]; *Tackett MSJ* [Doc. 122-1].)  The points and authorities focus entirely on the constitutional claims against Tackett and omit any reference to the remaining eight state-law claims still pending against him in the operative pleading, the SAC.  (*Tackett MSJ* [Doc. 122-1].)  Tackett is the party with the burden on his own motion for summary judgment, <u>see</u> Fed. R. Civ. P. 56, and he does not meet that burden here.  As such, his motion must be denied as to the remaining claims against him.

### B. The United States' Motion
### 1. FTCA—Negligent Hiring
### (Fifteenth Claim for Relief)

The United States moves for summary judgment on Plaintiffs' fifteenth claim for relief, for negligent screening and hiring, on the basis that the vehicular assault and the subsequent shooting were not foreseeable at the time Tackett was hired as an agent.  (*USA MSJ* [Doc. 124-1] 15:10–19:3.)

" 'An employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit.' "  <u>Phillips v. TLC Plumbing, Inc.</u>, 172 Cal. App. 4th 1133, 1139 (2009) (quoting <u>Roman Catholic Bishop v. Superior Court</u> 42 Cal. App. 4th 1556, 1564–65 (1996)).  " 'Liability for negligent hiring . . . is based upon the reasoning that if an enterprise hires individuals with characteristics which might pose a danger to customers or other employees, the enterprise should bear the loss caused by the wrongdoing of its incompetent or unfit employees.' "  <u>Id.</u> (quoting <u>Mendoza v. City of Los Angeles</u>, 66 Cal. App. 4th 1333, 1339 (1998).  "Negligence

17

liability will be imposed on an employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.' " <u>Id.</u> (quoting <u>Doe v. Capital Cities</u>, 50 Cal. App. 4th 1038, 1054 (1996)). " 'Liability for negligent . . . retention of an employee is one of direct liability for negligence, not vicarious liability.' " <u>Id.</u> (quoting <u>Delfino v. Agilent Technologies, Inc.</u>, 145 Cal. App. 4th 790, 815 (2009)).

"In 2006, the Restatement Third of Agency was published, adopting section 7.05 as the counterpart to section 213 of the Restatement Second of Agency, and stating:

> **"(1) A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent . . . ."**

<u>Phillips</u>, 172 Cal. App. 4th at 1139 (quoting Rest. 3d Agency, § 7.05, p. 177). " 'Liability under this rule is limited by basic principles of tort law, including requirements of causation and duty.' " <u>Id.</u> (quoting Rest. 3d Agency, § 7.05, com. c, p. 180.). "Furthermore, '[l]iability under this rule also requires some nexus or causal connection between the principal's negligence in selecting or controlling an actor, the actor's employment or work, and the harm suffered by the third party.' " <u>Id.</u> (quoting Rest. 3d Agency, § 7.05, com. c, illus. 5, p. 180).

"[Legal causation] is concerned with whether or not, assuming that a defendant was negligent and that his negligence was an actual cause of the plaintiff's injury, the defendant should be held responsible for the plaintiff's injury where the injury was brought about by a later cause of independent origin." <u>Akins v. Sonoma County</u>, 67 Cal. 2d 185, 199 (1967) "This question, in turn, revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable." <u>Id.</u> If either of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the plaintiff; if, however, it is determined that the intervening cause was not foreseeable and that the results which it

18

caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the plaintiff's injuries. Id. (citing Rest. 2d Torts § 440 et seq.) Accord 6 Witkin, Summary 11th Torts § 1348 (11th ed. 2018) ("Where, subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable.")

In the Court's April 27, 2015 order, the Court assumed true the allegation in the SAC that " 'Tackett jumped onto the hood of [Tachiquin's] car.' " (*Apr. 27, 2015 Order* [Doc. 103] 3:4–5.) As analyzed in footnote 2 above, there is no admissible evidence to support this allegation. No genuine dispute exists that the incident began in any way other than Tachiquin driving her car into—and then through—someone she knew to be law enforcement. It ended in a shooting death. Neither the intervening cause of Tachiquin's death (her hitting Tackett with her car), nor the result it caused (her shooting death), were reasonably foreseeable at the time of the hiring decision. See Akins, 67 Cal. 2d at 199; 6 Witkin, Summary 11th Torts § 1348 (11th ed. 2018).

A Border Patrol hiring manager could not have reasonably foreseen Tackett being struck with an automobile six years prior to the incident in question. And as the Ninth Circuit pointed out in its March, 2017 opinion,[7] despite the fact that Tackett's law enforcement record included several instances of unlawful searches and seizures, it included nothing of violence with a firearm. The highly unusual event of being hit with a car and carried on its hood for 773 feet is what prompted the shooting. Neither this

---

[7] The Ninth Circuit was analyzing a constitutional claim for deliberate indifference in hiring, not a negligent hiring claim against the government under the FTCA. Although the standards are different, the reasoning is similar.

event, nor the injury it caused, could have been foreseeable to those who hired Tackett. See Akins, 67 Cal. 2d at 199; 6 Witkin, Summary 11th Torts § 1348 (11th ed. 2018). Hiring Tackett was not the legal cause of Tachiquin's injuries.

Defendant's motion for summary judgment on the negligent hiring cause of action will be granted.

### 2. Other FTCA Claims
### (Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Sixteenth, Seventeenth, and Eighteenth Causes of Action[8])

The government's motion to dismiss the other FTCA claims (which, for eight claims, amounts to a sum total of three and a half pages) is predicated entirely on the premise that the Court must have found Tackett's actions reasonable in order to grant Tackett's motion.[9] (*USA MSJ* [Doc. 124-1] 19:5–22:12 (containing no authority standing for the proposition that a grant of qualified immunity to an agent based on a right not being clearly established necessarily absolves the government of liability).)

This is not a correct assessment of the law. Plumhoff, 134 S. Ct. at 2020; Pearson, 555 U.S. at 227. The Court makes no such finding.

The United States is the party with the burden on its own motion for summary judgment. See Fed. R. Civ. P. 56. It does not meet that burden here. As such, the government's motion for summary judgment will be denied as to the other FTCA claims. //

---

[8] The government represents in its reply brief that both this Court and the Ninth Circuit have held that pre-shooting conduct by Tackett is "not actionable." (*USA MSJ Reply* [Doc. 138] 18.) Neither court made any such finding. The context of the prior order was whether a seizure took place within the meaning of the Fourth Amendment—not whether Agent Tackett committed a tort.

[9] The government provides only a passing reference to Plaintiffs' Bane Act claim (with *de minimis* substantive analysis), and it does not mention the false imprisonment claim at all. (*USA MSJ* [Doc. 124-1] 19–22.)

IV.     **Conclusion & Order**

For foregoing reasons, Defendant Tackett's motion is **GRANTED IN PART AND DENIED IN PART**.  [Doc. 122.]  Specifically, it is **GRANTED** as to claims one through eight.  It is otherwise denied.

The United States' motion is **GRANTED IN PART AND DENIED IN PART**. [Doc. 124.]  Specifically, it is granted as to the fifteenth claim for relief.  It is otherwise denied.


**IT IS SO ORDERED.**

Dated:  June 4, 2018

Hon. Thomas J. Whelan
United States District Judge